776 F.2d 1156
 U.S.A. ex rel. Lawrence FORMAN
v.
Cecil McCALL, Chairman, U.S. Parole Commission.
Appeal of David Dart QUEEN, The United States Attorney for
the Middle District of Pennsylvania, on Behalf of
the UNITED STATES PAROLE COMMISSION.
 No. 84-5755.
 United States Court of Appeals,
Third Circuit.
 Argued June 10, 1985.
Decided Nov. 14, 1985.
As Amended Dec. 9, 1985.
 
 Henry J. Sadowski (argued), Regional Counsel, U.S. Parole Com'n, Philadelphia, Pa., David Dart Queen, U.S. Atty., Barbara L. Kosik, Asst. U.S. Atty., Scranton, Pa., for appellant.
 Louise O. Knight (argued), Clement & Knight, Lewisburg, Pa., for appellee.
 Before HIGGINBOTHAM, BECKER, Circuit Judges, and COHILL, District Judge*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This case, before us for the second time, presents the question whether the Adult Guidelines for Parole Decisionmaking of the United States Parole Commission constitute "laws" within the meaning of the ex post facto clause of the United States Constitution.[1] 1] In early 1980, appellee, Lawrence Forman, was given a "presumptive release date" based on Commission guidelines promulgated in 1979, see 28 C.F.R. Sec. 2.20 (1979), as applied to Forman's convictions for offenses committed between 1967 and 1974. In United States ex rel. Forman v. McCall, 709 F.2d 852 (3d Cir.1983) ("Forman I "), a panel of this court held that application of the 1979 guidelines to Forman was retrospective and to Forman's detriment. The panel further held that the guidelines would constitute laws for purposes of the ex post facto clause if they are applied without "substantial flexibility." The panel remanded the case for development of a full factual record concerning the manner in which the Commission applied the guidelines in practice.
 
 
 2
 On remand, the district court accepted written submissions by the parties and held a hearing during which it considered statistical evidence and expert testimony. The court found that the evidence revealed the absence of substantial flexibility in the application of the guidelines, and accordingly held that the guidelines constitute "laws" for ex post facto purposes. We have carefully reviewed the record developed on remand and conclude that it unequivocally demonstrates that the guidelines are applied with substantial flexibility. We therefore reverse.
 
 I.
 
 3
 The procedural history of this case was recounted at length in Forman I; a brief description of Forman's situation and our prior opinion will therefore suffice.
 
 
 4
 Forman was convicted of evading more than $2,000,000 in taxes between 1967 and 1974. When he received his initial parole hearing, in early 1980, the Parole Commission applied the then-current parole guidelines, promulgated in 1979. See 28 C.F.R. Sec. 2.20 (1979). The guidelines comprise a grid on which "offense characteristics" (designed to measure the severity of an offense) are plotted against "offender characteristics" (designed to measure the likelihood of recidivism) to yield a "customary" range of time that the offender is to serve before being released from prison on parole.[2] See Forman I, 709 F.2d at 857. See generally Warren v. United States Parole Commission, 659 F.2d 183, 189-93 (D.C.Cir.1981), cert. denied, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982) (detailed history of the guidelines). The Commission determined that under the 1979 guidelines, the "customary range" appropriate for Forman was forty to fifty-two months in prison.
 
 
 5
 Forman petitioned for a writ of habeas corpus in the district court for the Middle District of Pennsylvania pursuant to 28 U.S.C. Sec. 2241 (1976), claiming that the application of the 1979 guidelines violated the constitutional proscription against ex post facto laws. The district court agreed and ordered the Commission to afford Forman a new parole hearing to be conducted in accordance with the guidelines in effect at the time of the 1976 sentencing. The Commission complied, and Forman was ultimately released on parole after signing a Certificate reserving to the Commission the right to reincarcerate him should the district court's order be reversed or vacated on appeal, which promptly followed.
 
 
 6
 The Forman I panel first held that the law in effect at the time of the offense is the relevant law for purposes of ex post facto analysis. Forman I, 709 F.2d at 856-57. See Weaver v. Graham, 450 U.S. 24, 28-31, 101 S.Ct. 960, 964-65, 67 L.Ed.2d 17 (1981). In order to determine whether the retrospective application of the 1979 guidelines was detrimental to Forman, the panel looked to the 1974 guidelines, those in effect at the time of commission of Forman's offense, stating:
 
 
 7
 It thus appears that the Commission's application of the 1979 instead of the 1974 guidelines resulted in the establishment of a different "customary" range of incarceration in Forman's case: under the 1979 guidelines, Forman's worst-case prognosis was forty to fifty-two months, as compared with a thirty-six month worst-case presumptive minimum under the 1974 guidelines. Moreover, Forman's best-case prognosis was twenty-four to thirty-six months under the 1979 guidelines but twelve to sixteen months under the 1974 guidelines.
 
 
 8
 Forman I, 709 F.2d at 859. The panel thus concluded that the retrospective application of the 1979 guidelines was detrimental to Forman. The panel therefore went on to discuss the question whether the guidelines were "laws".
 
 
 9
 On that issue, following the precepts of Geraghty v. United States Parole Commission, 579 F.2d 238 (3d Cir.1978) ("Geraghty I "), vacated and remanded on other grounds, 455 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), the panel held that, if administered without sufficient flexibility, the guidelines could be considered laws for ex post facto purposes. This position has since been rejected by every other circuit that has addressed the issue.[3] However, it remains the law of this circuit until overruled by the in banc court. See Third Circuit Internal Operating Procedures, Chapter VIII C.
 
 
 10
 In reaching its decision, the panel rejected the proposition that the guidelines could not be laws for ex post facto purposes simply because they are administrative regulations, and not statutes, Forman I, 709 F.2d at 859 (citing Geraghty I, 579 F.2d at 266).[4]
 
 
 11
 The panel noted, but rejected, the argument that the guidelines fall within the class of regulations, "possibly excluded" from the ambit of the ex post facto clause, consisting of "no more than general statements of policy, interpretive rules, or rules relating to agency practice or procedure." Forman I, 709 F.2d at 859 n. 17 (citing Pickus v. United States Bd. of Parole, 507 F.2d 1107, 1112-14 (D.C.Cir.1974) (rejecting contention that guidelines are merely statements of general policy and holding their promulgation to be subject to rulemaking provisions of Administrative Procedure Act)). On the contrary, the panel recognized that the guidelines play an important role in the parole process:
 
 
 12
 "Unbounded discretion probably does not exist in the Commission's decisionmaking; the guidelines provide perimeters that may be overstepped only upon a showing of good cause, see 18 U.S.C. Sec. 4206(c) (1976), and changes in the guidelines appear to shape the exercise of that discretion."
 
 
 13
 Forman I, 709 F.2d at 861 (footnote omitted).
 
 
 14
 However, the panel declined to adopt an approach, then advocated by Forman, which looks only to the statutory language and legislative history for enlightenment as to the ex post facto effect of the guidelines. The panel thus rejected the position that simply because all parole decisions must fall within the guidelines or depart from them only upon a showing of "good cause," see 18 U.S.C. Sec. 4206(c), the guidelines affect all parole decisions, the Commission may never ignore them, and therefore they constitute a law for ex post facto purposes. The panel relied instead upon the approach taken in our earlier opinion in Geraghty I, and reaffirmed the reasoning of that opinion, which treated the ex post facto question as essentially one of fact:
 
 
 15
 Geraghty recognized both that the Parole Commission's "discretion" is severely constricted because the Commission must either follow its guidelines except for good cause or should revise the guidelines when parole decisions outside the regulations become too frequent and that the " 'channel for discretion' " under the guidelines therefore appeared to be "in actuality an unyielding conduit.".... Geraghty held that the manner in which the Commission actually applied its guidelines still constituted a question of fact.
 
 
 16
 Forman I, 709 F.2d at 862 (footnote omitted).
 
 
 17
 As refined by Forman I, the inquiry thus became, as we have noted, whether the guidelines in fact are applied with "substantial flexibility." Id. The panel ruled that a Commission practice to accord each inmate individualized treatment would not necessarily be dispositive of the issue, but that the "range and contours of that allegedly individualized treatment," id. at 861, would also be relevant to the determination of whether the guidelines were merely "a channel for discretion," or "an unyielding conduit" which constitutes a "law" for ex post facto purposes. The district court was therefore invited to rely on a wide variety of evidence on remand, including statistical evidence concerning the frequency with which parole decisions are made within the guidelines. We now turn to the district court record and the court's findings.[5]II.
 
 
 18
 After receiving extensive expert reports, briefs, and expert testimony, the district court made the following specific findings of fact:
 
 
 19
 1. Statistically, the Parole Commission decisions fall within the guideline parameters in 85-90% of the cases, thus [there is] a deviation of only 10-15%.
 
 
 20
 2. The range and contour of the "individualized decisions" is relatively smooth and, for the greatest part, within the guidelines.
 
 
 21
 3. Nominally the Parole Guidelines are discretionary but in actuality, discretion is so absent that the guidelines are revamped whenever it appears that a percentage of the Parole Commission decisions fall outside of the guideline parameters.
 
 
 22
 Opinion of the District Court at 13.
 
 
 23
 The court explicitly disclaimed reliance on statistical evidence alone, however, and considered additional testimony and other submissions relating to the practice of the Commission in acting upon applications for parole. The court stated that when the Commission guidelines are used, "there is little or no room for discretion." Id. Applying these findings of fact to the standard set out in Forman I, the court concluded that the "guidelines are woodenly applied, thus constituting an 'unyielding conduit' [Forman I, 709 F.2d] at 863, void of substantial flexibility. [Id.] at 862." Opinion of the District Court at 14 (reprinted in Appendix at 179). The Commission challenges on appeal both the district court's findings of fact and its conclusion of law. Our review of the district court's conclusions of law is plenary, see Tustin v. Heckler, 749 F.2d 1055, 1060 (3d Cir.1984); we review findings of fact under a clearly erroneous standard of review. Cf. Fed.R.Civ.P. 52(a).
 
 III.
 
 24
 Much of the record developed on remand consists of statistical evidence concerning the frequency with which the Commission renders parole decisions within the guideline ranges computed for inmates. Forman contends that during the period covered by those statistics (October 1, 1977, to March 31, 1983), 79.9% to 86.5% of the parole decisions have fallen within the guideline ranges. Those same statistics show some variation in this frequency among the five regional offices of the Commission; for the same period, the highest and lowest rates of compliance by a single regional office are 90.7% and 76.7%. The district court, as we have seen, found that within-guideline decisions accounted for "85% to 90%" of all parole decisions.[6] The Commission asserts that both Forman and the district court are mistaken, and submits that, properly interpreted, the data reveal that decisions within the guidelines were rendered, for all regions combined, in 75.4% of the cases, with a regional variance of between 73.5% and 78.3%. We therefore turn to an evaluation of the government's contentions regarding the data.
 
 
 25
 The discrepancy between the Commission's figures and Forman's is rooted in the different definitions of "within" and "outside" the guidelines employed by the parties. Forman's presentation of the data adopts the convention used in the Annual Reports of the Commission, which counts as "outside" the guidelines only those decisions that must be accompanied by statements of "good cause." See 18 U.S.C. Sec. 4206(c) (Commission must furnish inmate "good cause" justifying a decision outside the appropriate guideline range). All other decisions are included in the "within" category in the annual reports. The Commission, on the other hand, urges that for purposes of determining whether the guidelines are applied with substantial flexibility, a more sophisticated approach to the data is necessary. This approach isolates certain kinds of decisions that are counted as "within" decisions in the annual reports. The Commission submits that for present purposes these cases should be treated as decisions "outside" the guidelines, which, technically, they are, or at least excluded from the data base entirely.
 
 
 26
 The substance of the Commission's contention arises from the interaction between the function of the Commission and that of the courts in imposing sentences. The two categories of decisions that account for the bulk of the difference between the Commission's figures and the district court's findings are those cases in which the Committee was precluded from exercising its usual latitude by reason of a maximum sentence shorter than an inmate's computed guideline range or a minimum sentence longer than the range. These categories of decisions were described in detail in an affidavit submitted by Dr. Peter Hoffman, Research Director for the Parole Commission and its predecessor, the United States Parole Board, and a major participant in the development and refinement of the guidelines. Portions of Dr. Hoffman's affidavit are rescribed in the margin.[7]
 
 
 27
 Forman argues that these cases are properly counted as within the guidelines because in deciding them, the Commission "applies the guidelines to the fullest extent possible." However, the Commission argues persuasively that in these situations a decision that Forman counts as within the guidelines does not in any way indicate the absence of flexibility. Rather, these decisions, which on average accounted for 27% of the Commission's decisions, see note 7, supra (sum of averages for BELOW CTE and ABOVE MJS classifications), are essentially phenomena resulting from the imposition of relatively long or short judicial sentences. As such, these decisions have almost no significance for the inquiry before the court. For example, where a long minimum sentence precludes the Commission from setting a release date within or below the guidelines, we have no way of knowing the decision which the Commission would have rendered based on its evaluation of the relevant factors. In such a case, the Commission is robbed of any discretion to choose among the "within," "above," and "below" categories. All we can know from the data is that the Commission decided not to depart even further from the guideline range than required by the minimum sentence. Similarly, when the maximum sentence falls below the computed range, we can discern from a Commission decision only its judgment whether it was appropriate to go even further below the guideline range.
 
 
 28
 When these decisions are excluded from the data base altogether, the average annual percentage of within-guideline decisions drops to 75.4%. We agree with the Commission's argument and we believe that this statistic reflects a representation of the data better suited to present purposes than the data taken by Forman unmodified from the Parole Commission annual reports. We therefore hold that as a matter of law, these categories of anomalous decisions should have been excluded from consideration on the issue of substantial flexibility. Inasmuch as it appears that the district court accepted Forman's characterization of these decisions as "within" the guidelines, the court's finding of fact on this issue was clearly erroneous. We further conclude that a 25% deviation from the prescribed guideline ranges--that is to say, a finding of "good cause" in one out of every four cases in which such a finding can have any effect on the inmate's release date--is strong evidence of "substantial flexibility" in the application of the parole guidelines. We thus hold that, under the data of record, the guidelines are being administered with sufficient flexibility and that they do not constitute "laws" for purposes of the ex post facto clause. See Forman I.
 
 
 29
 It would appear from the unrebutted testimony of Dr. Hoffman at the hearing that this result is no accident. Dr. Hoffman testified that the Commission takes into account all relevant aggravating and mitigating circumstances in setting a release date. Tr. at 70-130. See also 18 U.S.C. Sec. 4206(a); 28 C.F.R. Sec. 2.19. It is true that Dr. Hoffman conceded the routine nature of assigning offense severities in about half the cases decided by the Commission (Tr. at 69); however, his testimony also revealed that assignment of the salient factor scores, designed to assess the likelihood of recidivism by an inmate, involved a much less mechanical inquiry. Tr. at 73-74. Moreover, Dr. Hoffman testified that in many cases, the Commissioners disagree among themselves as to the appropriate decision. Tr. at 89-90. Such evidence is counter-indicative of an "unyielding conduit."
 
 
 30
 Forman argues that other evidence presented at the hearing also tends to establish the absence of "substantial flexibility." Specifically, Forman pointed to the so-called Principle of Parsimony, a rule contained in the Manual which is distributed to all Commissioners and hearing examiners. Parole Commission Rules and Procedures Manual, 2.23-02 (May 13, 1983). Under the principle, which is presumably what the district court had in mind in finding that the "range and contours of the decisions was relatively smooth," Opinion of the District Court at 13 (reprinted in Appendix at 178), whenever a decision within the guidelines is recommended, it is expected that the release date will be in the lower half of the guideline range unless one or more factors is present. Forman also submitted evidence showing that in Fiscal Year 1983 approximately 45% of decisions within the guideline range fell within the lower half of the range. We cannot agree that the Principle of Parsimony demonstrates the absence of substantial flexibility. The manual itself stresses that the principle "is intended to provide a methodology to promote analysis, not a mechanical rule."[8]
 
 IV.
 
 31
 In sum, we hold that the Adult Guidelines of the Parole Commission are applied with "substantial flexibility" as required by Forman I. Accordingly, the judgment of the district court will be reversed.[9]
 
 
 32
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring in the judgment.
 
 
 33
 In United States ex rel. Forman v. McCall, ("Forman I "), 709 F.2d 852 (3d Cir.1983) this court held that, as applied to petitioner, the 1979 parole guidelines were both retroactive and disadvantageous. We also held, following Geraghty v. United States Parole Commission ("Geraghty I "), 579 F.2d 238 (3d Cir.1978), vacated and remanded on other grounds, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), that the guidelines should be considered "laws" within the meaning of the ex post facto clause if they were "applied without substantial flexibility." 709 F.2d at 862. We remanded for factfinding as to what extent the Parole Commission actually exercised its discretion not to adhere to its parole guidelines. Id. We did not state then, and the majority does not state now, what degree of adherence would suffice to make the guidelines "laws," though it is now apparent that 75.4% adherence is not enough.
 
 
 34
 The majority now reverses on the ground that the district court's factual findings of 85-90% adherence were clearly erroneous, and that 75.4% is not enough. I am not as certain as my colleagues that the district court's findings were clearly erroneous, but I write separately to express an even more fundamental reservation. I believe that the standard announced in Forman I for determining whether the guidelines are "laws" was incorrect under ex post facto clause jurisprudence and unwise as a matter of policy. Because I also reach the conclusion that the guidelines are not "laws," albeit by a different route, I concur in the judgment of the majority. Moreover, I recognize that under our Internal Operating Procedures we are bound to follow a prior panel decision. I urge, however, that the Forman I rule be reconsidered by the court in banc.
 
 I.
 
 35
 An ex post facto law is one that,
 
 
 36
 makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.... [T]hat aggravates a crime, or makes it greater than it was, when committed.... [T]hat changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.... [T]hat alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender.
 
 
 37
 Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). Directed principally against the tyrannical and arbitrary exercise of legislative power,[1] the ex post facto clause protects against laws that are expressions of legislators' "ambition, or personal resentment and vindictive malice," Calder v. Bull, 3 U.S. (3 Dall.) at 389, and "upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." Weaver v. Graham, 450 U.S. 24, 29 n. 10, 101 S.Ct. 960, 964 n. 10, 67 L.Ed.2d 17 (1981). Though the preeminent evil of ex post facto laws is the manifestation of excessive and arbitrary legislative power, courts have observed that they also weaken the system of justice by denying citizens the opportunity to know what the law requires and what punishment it exacts. "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver, 450 U.S. at 28-29, 101 S.Ct. at 964.[2]
 
 
 38
 The Supreme Court has expressly reserved judgment on whether retroactive application of parole guidelines may violate the ex post facto clause. United States Parole Commission v. Geraghty, 445 U.S. 388, 408, 100 S.Ct. 1202, 1214, 63 L.Ed.2d 479 (1980); United States v. Addonizio, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979). But its decisions on whether statutory changes affecting the duration of a prisoner's confinement violate the ex post facto prohibition provide some guidance. Weaver, the Court's most recent pronouncement on the subject, establishes a two-part test for determining whether a penal statute is unconstitutional as an ex post facto law when applied to a petitioner whose crime was committed before the statute's enactment: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." 450 U.S. at 29, 101 S.Ct. at 964 (footnotes omitted). I have no quarrel with Forman I 's holdings that the guidelines at issue were retrospectively applied and that they disadvantaged petitioner. Because the Parole Commission's guidelines are administrative regulations rather than statutes, however, this court must consider a third and novel issue, whether the guidelines are "laws" within the meaning of the ex post facto clause.
 
 
 39
 My disagreement with current Third Circuit law centers around how to conduct this inquiry. In Geraghty I and Forman I, the court established an essentially statistical test--how many times do the Parole Commission's parole determinations coincide with its guidelines? If the two factors--outcome and guideline--are congruent on a sufficient number of occasions, the court suggested, insufficient administrative flexibility would be demonstrated, and the "guidelines" would perforce be "laws." Forman I, 709 F.2d at 862; Geraghty I, 579 F.2d at 266-67. The court has not yet stated what percentage of compliance transforms a guideline into a law.[3] But were it to do so, we would have a simple numerical test. After that, the assumption seems to be, the district courts need only periodically check what the current figure is to see whether the Parole Commission is acting as a quasi-legislature. In my view this test is insufficient to determine whether an administrative guideline is a law within the meaning of the ex post facto clause; a statistical tendency does not clothe a guideline with the trappings of a law. As the Supreme Court stated in an analogous context:
 
 
 40
 No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections; a contrary conclusion would trivialize the Constitution. The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency.
 
 
 41
 Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981) (emphasis added).[4]
 
 
 42
 I certainly subscribe to what I understand to be the underlying premise of Geraghty I: that Congress cannot, by delegation, escape constitutional limitations on its power. 579 F.2d at 266. As I interpret this principle, it requires us to examine the scope of the power delegated to the Parole Commission by Congress, rather than the Commission's actual practices. For if Congress intended that the Commission should have relatively unfettered discretion to grant or deny parole in individual cases, it does not matter--for purposes of ex post facto analysis[5]--that in the great majority of cases the Commission conforms its decisions to the narrower range of options found in the guidelines. It is the intent of Congress, not the practices of the Commission, that determines whether the guidelines are to have the force and effect of laws. Accordingly, I would examine the parole statute and its legislative history to determine whether it established substantial constraints on the Commission's decisionmaking in individual cases. As I discuss in Part II, I find that Congress intended to place no such constraints on the discretion of the Parole Commission.
 
 II.
 
 43
 Parole was first instituted in this country in the 1870's; the Sixty-First Congress established the federal parole system in 1910. Prior to then, legislators viewed the primary purpose of incarceration as retribution and punishment, and prescribed the period of incarceration for each crime with specificity. United States v. Grayson, 438 U.S. 41, 45-46, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978). Parole was initially a system for showing clemency to prisoners. Those who behaved well were granted the privilege of supervised release. See Comptroller General of the United States, Federal Parole Practices: Better Management and Legislative Changes are Needed 2 (July 16, 1982) [hereinafter cited as "Federal Parole Practices "]. In 1930, Congress created the United States Board of Parole. Act of May 13, 1930, ch. 255, 46 Stat. 272 (1931). By that time, the legislators had begun to adopt a new penal philosophy. This "medical model" viewed the criminal as ill, imprisonment as a period of cure, and parole as the point at which the prisoner's supervisors deemed him or her sufficiently rehabilitated to be safely released.[6]
 
 
 44
 This approach ... assumed that because it was impossible to accurately predict how long the cure would take, judges should set only the outside limits of the prison term. The parole board would assess the progress of the offender toward rehabilitation and decide when the offender should be released. Parole boards were granted wide discretion to make predictions about whether a cure had taken place and whether the offender could safely be released into society.
 
 
 45
 Federal Parole Practices at 2. See also, Warren v. United States Parole Commission, 659 F.2d at 189-190.
 
 
 46
 The theory that parole release is the proper result of rehabilitation has remained dominant.[7] But in 1967, the President's Commission on Law Enforcement and the Administration of Justice criticized the manner in which the federal parole system actually worked. The Commission's two central concerns were that there were no explicit standards for deciding whether and when to parole a prisoner, and that the prisoner received no reliable, written information about his or her release. President's Commission on Law Enforcement and the Administration of Justice, The Challenge of Crime in a Free Society 179-83 (1967). In response to these criticisms, the Parole Board in 1973 instituted parole guidelines to be followed in making all federal parole decisions. 38 Fed.Reg. 31,942 (1973).[8]
 
 
 47
 In 1976, Congress made the guideline system a legislative requirement in the Parole Commission and Reorganization Act ("PCRA"), Pub.L. No. 94-233, Sec. 2, 90 Stat. 219 (1978) (codified at 18 U.S.C. Sec. 4203 (1982)). "This legislation was an effort to constrain and guide parole discretion through more rational, consistent, and equitable decisionmaking." Federal Parole Practices at 3. In 1984, Congress, still dissatisfied with both the medical model and the system of sentencing and parole release that the model engendered, passed the Sentencing Reform Act of 1984, Pub.L. No. 98-473, 1984 U.S.Code Cong. & Ad.News (98 Stat.) 1837, 1987. This law provides for the future abolition of parole and the Parole Commission.[9]
 
 
 48
 Throughout the evolution of the parole system, courts have viewed parole decisions as essentially discretionary. As recently as 1979, the Supreme Court, discussing Nebraska's parole system, wrote,
 
 
 49
 [i]n parole releases, like its siblings probation release and institutional rehabilitation, few certainties exist. In each case, the decision differs from the traditional mold of judicial decisionmaking in that the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community.
 
 
 50
 Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 8, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979) (footnote omitted).
 
 
 51
 In my view, Congress' purpose in passing the PCRA was to promote uniformity in parole decisionmaking and to moderate, though not eliminate, the influence of the medical model by emphasizing notions of just punishment. The PCRA shifted ultimate parole decisionmaking power from individual parole officials to a central Parole Commission, with five regional offices. Congress believed that although "[t]here is no body of competent empirical knowledge upon which parole decision-makers can rely, ... it is important for the parole process to achieve an aura of fairness by basing determinations of just punishment on comparable periods of incarceration for similar offenses committed under similar circumstances." H.R.Conf.Rep. No. 838, 94th Cong., 2d Sess. 26, reprinted in 1976 U.S.Code Cong. & Ad.News 351, 358 [hereinafter cited as "Conference Report"].[10]
 
 
 52
 In order to bring about greater parity in punishment, Congress required the Parole Commission to establish guidelines and procedural rules for parole determinations. The guidelines are intended to be followed by hearing examiners in making recommendations to one of the five regional commissioners, who may adopt the recommendation and enter a decision, or make his or her own decision. Conference Report at 22; 1976 U.S.Code Cong. & Ad.News at 354-55; 18 U.S.C. Sec. 4203(a), (b), (c) (1982).
 
 
 53
 Notwithstanding the goal of reducing the disparity of prison terms for like offenders and offenses, and the establishment of a guideline system toward this end, Congress did not establish substantial constraints on the Parole Commission's discretion in individual cases. In discussing parole release criteria, the Conference Committee stated,
 
 
 54
 First, it is the intent of the Conferees that the Parole Commission reach a judgment on the institutional behavior of each prospective parolee....
 
 
 55
 Second, it is the intent of the Conferees that the Parole Commission review and consider both the nature and circumstances of the offense and the history and characteristics of the prisoner.
 
 
 56
 Conference Report at 25; 1976 U.S.Code Cong. & Ad.News at 358 (emphasis added).
 
 
 57
 In addition to providing that parole depends in the first instance on the individual's prison behavior and individual characteristics, and the circumstances of the offense, the PCRA also allows the Commission to grant or deny parole notwithstanding the guidelines, as long as there is good cause to do so and the prisoner is given a written explanation of the decision. 18 U.S.C. Sec. 4206(c) (1982). The Conference report states that,
 
 
 58
 [t]he definition of what constitutes good cause to go outside the established guidelines can not be a precise one, because it must be broad enough to cover many circumstances....
 
 
 59
 ....
 
 
 60
 ... By focusing on the justifications for exceptions to the guidelines, subsequent administrative review ... will be facilitated and there will be more uniformity....
 
 
 61
 If decisions to go above or below parole guidelines are frequent, the Commission should reevaluate its guidelines.
 
 
 62
 Conference Report at 27; 1976 U.S.Code Cong. & Ad.News at 359-360.
 
 
 63
 To me, the PCRA's provisions, viewed together, indicate that the Congress took steps toward more uniformity of prison terms, and away from the medical model, but was unwilling to abandon altogether the discretionary determinations about individual prisoners that have historically characterized the parole system.[11] There are no sanctions for not following the guidelines. Instead, Congress established a mechanism that both requires a set of guidelines, and encourages their alteration in the event the Parole Commissioners do not follow them.[12] In my view, this deliberate flexibility precludes characterizing the guidelines as laws within the meaning of the ex post facto clause. See also Ruip v. United States, 555 F.2d 1331 (6th Cir.1977); Roth v. United States Parole Commission, 24 F.2d 836 (9th Cir.1984); Dufresne v. Baer, 744 F.2d 1543 (11th Cir.1984).
 
 III.
 
 64
 We have now ruled twice that the Parole Commission's practice of applying its regular parole guideline revisions to all current prisoners instead of only to those prisoners who committed offenses on or after the effective date of the latest revision, may violate the Constitution because "if applied without substantial flexibility, the parole guidelines constitute 'laws' within the meaning of the ex post facto clause." Forman I, 709 F.2d at 862; see also Geraghty I, 579 F.2d at 267-68. Notwithstanding these two rulings, we have never actually held that the Parole Commission applies its guidelines without the requisite flexibility and do not do so in this case. Indeed, the meaning of the phrase "substantial flexibility" is so ambiguous that I cannot foresee when we would ever do so. Moreover, as the majority notes, the Forman I test has been rejected by every other circuit that has addressed the issue. See Majority Opinion at footnote 3. To permit such an ambiguity to remain at the center of the daily operation of the United States parole system, in this circuit, would ill serve the parole commissioners and hundreds of parole officers who seek to do an honest job in complying with the law and upholding the Constitution. It would also ill serve the district courts of this circuit, which may now have to reexamine Parole Commission practices each time a prisoner who has been denied parole asserts that he or she has not been treated with the necessary flexibility.
 
 
 65
 It is for these judicial policy reasons, as well as my belief that the Parole Commission's guidelines are not "laws" within the meaning of the ex post facto clause, that I concur only in the judgment of Forman II, and urge that the rationale of Forman I, and its predecessor, Geraghty I, be considered in banc.
 
 
 
 *
 Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 "No Bill of Attainder or ex post facto law shall be passed." U.S. Const. art. I, Sec. 9, cl. 3; cf. id., art. I, Sec. 10, cl. 1 ("No State shall pass any Bill of Attainder [or] ex post facto law")
 
 
 [2]
 Application of the guidelines assumes satisfactory institutional adjustment by the inmate. Since 1979, the Commission has afforded initial hearings to most prisoners, regardless of their parole eligibility date, within 120 days of confinement. See 28 C.F.R. Sec. 2.12 (1985); 18 U.S.C. Sec. 4208(a) (1982). The decisions rendered at these hearings assume good institutional adjustment in the future. At subsequent hearings, the Commission may accelerate or delay a presumptive release date if an inmate's institutional adjustment warrants. See 28 C.F.R. Sec. 2.14 (1985); Geraghty v. United States Parole Commission, 719 F.2d 1199, 1207 (3d Cir.1983)
 
 
 [3]
 See Northeast Regional Parole Commission v. DiNapoli, 764 F.2d 143 (2d Cir.1985); Dufresne v. Baer, 744 F.2d 1543 (11th Cir.1984); Paschal v. Wainwright, 738 F.2d 1173 (11th Cir.1983); Richardson v. United States Parole Commission, 729 F.2d 1154 (8th Cir.1984); Roth v. United States Parole Commission, 724 F.2d 836 (9th Cir.1984). See also Portley v. Grossman, 444 U.S. 1311, 100 S.Ct. 714, 62 L.Ed.2d 723 (Rehnquist, Circuit Justice, 1980); Stroud v. United States Parole Commission, 668 F.2d 843 (5th Cir.1982); Warren v. United States Parole Commission, 659 F.2d 183 (D.C.Cir.1981), cert. denied, 445 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); Hayward v. United States Parole Commission, 659 F.2d 857 (8th Cir.1981), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); Priore v. Nelson, 626 F.2d 211 (2d Cir.1980); Zeidman v. United States Parole Commission, 593 F.2d 806 (7th Cir.1979); Rifai v. United States Parole Commission, 586 F.2d 695 (9th Cir.1978); Shepard v. Taylor, 556 F.2d 648 (2d Cir.1977); Ruip v. United States, 555 F.2d 1331 (6th Cir.1977); Joost v. United States Parole Commission, 535 F.Supp. 71 (D.Kan.1982). But see Allen v. Hadden, 536 F.Supp. 586, 595-596 (D.Colo.1982); Note, Application of the Federal Parole Guidelines to Certain Prisoners: An Ex Post Facto Violation, 62 B.U.L.Rev. 515, 518-23
 
 
 [4]
 But see supra n. 3 and cases cited therein. Cf. Geraghty v. United States Parole Commission, 719 F.2d 1199 (3d Cir.1983) ("Geraghty II ") (suggesting that guidelines not enacted pursuant to a delegation of legislative or judicial authority, but holding that if they are, the delegation is constitutional)
 
 
 [5]
 On this appeal, the government contends that the guidelines are not promulgated pursuant to a delegation of legislative authority and, therefore, fail to satisfy the essential criterion for a regulation to have the effect of a law. In support of this contention, the government cites Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), and Geraghty II. In Brown, the Court held that for an agency regulation to be a "law" it must both be a "substantive" rule and be issued pursuant to a delegation of legislative power. 441 U.S. at 301-303, 99 S.Ct. at 1717-1718. The government asserts that the guidelines are not substantive but rather belong to that class of rules called "general statements of policy." This issue was decided otherwise in Forman I, 709 F.2d at 859 n. 17, and we are bound by that prior decision. See Third Circuit Internal Operating Procedures, Chapter VIII C
 With respect to the second portion of the Brown test, the government relies on this court's decision in Geraghty II as authority for the proposition that the guidelines are not promulgated pursuant to a delegation of legislative power. We believe the government misapprehends the significance of Geraghty II for this case. It is true that certain passages in the opinion might be read to suggest a holding along the lines advanced by the government here. See 719 F.2d at 1212 ("because the guidelines establish the time to be served before release in the typical case, they do not conflict with or assume the legislative function of setting maximum penalties for the most heinous ones") (emphasis in original). As the opinion makes quite explicit, however, the precise issue before the court in Geraghty II was whether the guidelines constitute a standardless, hence unconstitutional delegation of the legislative function. Id. The court answered that question in the negative, specifically refraining from any consideration of the ex post facto effect of the guidelines. On the contrary, the court noted the continuing vitality of the discussion in Geraghty I, relied upon by the Forman I panel, concerning the appropriate inquiry for a court faced with a challenge to the guidelines upon ex post facto grounds. We concede that there may be some tension between the aspects of the opinions in the two Geraghty cases. See Geraghty II, 719 F.2d at 1213 (statement by Circuit Judge Adams sur denial of rehearing in banc) (suggesting that inconsistencies between Geraghty I and II be resolved by full court). At the same time, however, the Geraghty II panel had no more power than we have to overrule the previous decision in Forman I. See O. Hommel Co. v. Ferro Corp., 659 F.2d 340, 354 (3d Cir.1981).
 The government argues in the alternative that we are not precluded from reexamining the premises of the holding in Forman I and taking into account what the government perceives to be the impact of the Supreme Court's holding in Brown. While we doubt that such an examination would be fruitful in any event, in view of our holding today, favorable to the government, we decline the invitation to retrace old ground.
 
 
 [6]
 There is some discrepancy between Forman's submissions and the findings by the district court. Specifically, the finding of "85% to 90%" compliance appears to be a rough estimate rather than a precise mathematical average derived from the raw data. We will assume, however, that the district court's findings are essentially in agreement with Forman's presentation of the data and their implications
 
 
 [7]
 The following description applies to categories of cases in which decisions formally outside the computed guideline range were rendered, due to the nature of the judicial sentence
 BELOW CTE ["continue to expiration"] Reflects the number of cases where the prisoner was continued to expiration below the guidelines. This would occur in cases in which a short sentence was imposed resulting in a mandatory release date below the computed guideline range. In these cases, the Commission is limited by the sentence from rendering a decision above or within the parole guidelines. The Commission would have the discretion to render a decision further below the guidelines than by operation of sentence (mandatory release date). If the Commission so chose, these cases would be [classified as] "BELOW DISC," [decisions below the guidelines accompanied by statements of good cause].
 ABOVE MJS ["minimum judicial sentence"] Reflects those cases where the effective parole date or presumptive parole date was established above the guidelines solely because the minimum term (period of parole ineligibility) established by the Sentencing Court precluded the Commission from rendering an earlier release date. For example, this would encompass those situations in which the Commission ordered an offender released after service of seventy-two months on an eighteen year regular adult sentence [minimum parole eligibility is normally one-third] wherein the guideline range was 40-52 months. The Commission would not, in that case, have the discretion to render a decision within or below the computed parole guideline range. The Commission, of course, would have the discretion to render a decision above the parole eligibility date, and further above the parole guideline range.... Those cases would be [classified as] "ABOVE DISC," [decisions above the guidelines accompanied by statements of good cause].
 Affidavit of Dr. Peter Hoffman 9-11, reprinted in Appendix at 20-22. These two categories of decisions accounted for a significant number of decisions during the period covered by the data in the record. For all regions of Commission combined, the relevant percentages were:
 (FY) 1978 1979 1980 1981 1982 1983 TOTAL
 BELOW CTE 26.4 19.4 16.4 22.0 22.4 22.4 21.5
 ABOVE MUS 0.1 5.6 10.9 6.5 6.4 6.1 5.7
 Two other categories, which together account for the remainder of the difference between the statistics submitted by the respective parties, are much less significant. Dr. Hoffman's affidavit described them as follows:
 BELOW 4YR This category is designed to filter out those cases which were continued for a four year reconsideration hearing under the old policy (in effect between September 6, 1977 through March 5, 1979) wherein the date of the four year reconsideration hearing would fall below the computed guideline range. It could not be determined from that information whether a decision below the guidelines, within the guidelines, or above the guidelines at such reconsideration hearing would be rendered.
 ABOVE PRL This row reflects those cases in which an effective parole date was rendered above the guidelines because the time in custody at the initial parole hearing precluded the Commission from rendering a decision within or below the guidelines. For example, a prisoner could choose to waive his parole hearing until he had served a period of time on his sentence exceeding his guideline range. This would not be a discretionary decision by the Commission to go above the guidelines. If the Commission exercised discretion to go further above the computed parole guidelines, the case would be [classified] as "ABOVE DISC."
 Affidavit of Dr. Peter Hoffman at 9-10, reprinted in Appendix at 20-21. For all regions, the statistics for these two categories of decisions are as follows (in percentages):
 (FY) 1978 1979 1980 1981 1982 1983 TOTAL
 BELOW 4YR 1.6 0.6 0 0 0 0 0.4
 ABOVE PRL 3.7 2.9 1.8 1.6 1.0 1.4 2.2
 Appendix at 29 (Table of Guideline Usage).
 
 
 [8]
 We also discount the significance of the examples in the Manual of factors warranting decisions outside the guidelines, inasmuch as the examples are illustrative, not exhaustive. Parole Commission Rules and Procedures Manual, Sec. 2.20-06, (October 1, 1983). Moreover, Dr. Hoffman testified that in fact decisions are made to go outside the guidelines for reasons not listed. Tr. at 130
 
 
 [9]
 The Commission contends that the district court applied the "substantial flexibility" test of Forman I in a way that guarantees that any system of guidelines that is not routinely ignored will be found to constitute a "law" for ex post facto purposes. Indicative of this error, in the Commission's submission, is the court's treatment of certain of the evidence developed on remand. In support of its position, the Commission proffered evidence of a variety of ways in which it exercises what it calls "discretion" in administering the guidelines. As noted by the district court, the Commission argues that it exercises discretion:
 
 
 [1]
 In the adoption of the guidelines as such
 
 
 [2]
 In determining the Offense Severity Classification
 
 
 [3]
 In determining the range of months to be served
 
 
 [4]
 In the modifications that have been made to the guidelines over the years since their initial adoption
 
 
 [5]
 In the computation of the components of the guidelines in determining the seriousness for the offense
 
 
 [6]
 In the computation of the salient factor score
 
 
 [7]
 In determining where within the guidelines the release decision should fall
 
 
 [8]
 In deciding to go outside the guidelines
 Opinion of the District Court at 9. As far as the district court's opinion reveals, however, in evaluating the record the court considered as evidence of "substantial flexibility" only the final item--the frequency with which the Commission chose, for "good cause," to depart from the recommended guideline range in particular cases. The court reasoned that the other examples of "discretion" are "aimed more at ... the discretion used in finding which portion of the guidelines applies to a specific case, rather than to the discretion used in each individual instance of determining when parole will be granted." Id. at 10. Because we decide in favor of the Commission for the reasons stated in the text, we need not discuss the significance of any of these other ways in which the Commission asserts that it exercises discretion.
 
 
 [1]
 See The Federalist No. 44 (J. Madison) & No. 84 (A. Hamilton). See generally Warren v. United States Parole Commission, 659 F.2d 183, 186-89 (D.C.Cir.1981)
 
 
 [2]
 Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense
 Weaver, 450 U.S. at 30-31, 101 S.Ct. at 965 (footnote omitted).
 
 
 [3]
 The Geraghty I court did, however, suggest numerical possibilities:
 [I]f in practice the parole authorities found good cause to deviate from the guidelines in 60% of the cases, for example, it might be argued that their discretion is, in fact, unfettered. However, ... [one] decision of this Court took judicial notice of estimates of compliance with the guidelines ranging from 88% to 94%. It thus appears that the "channel for discretion" provided by the guidelines is in actuality an unyielding conduit.
 Geraghty I, 579 F.2d at 267 (footnote omitted).
 
 
 [4]
 In Dumschat, the Court held that the fact that the Connecticut Board of Pardons granted approximately three-fourths of the applications for communication of life sentences created no "liberty interest" in life-terms inmates that would require the Board to explain its reasons for denying applications. The Court also noted that "[a] commutation decision ... shares some of the characteristics of a decision whether to grant parole." 452 U.S. at 464, 101 S.Ct. at 2464
 
 
 [5]
 It is important to keep in mind that we are not dealing with a contention that the delegation of authority to promulgate guidelines was unconstitutional, or with a challenge to either the validity of the guidelines on their face or their prospective application. We are concerned only with their retroactive revision
 
 
 [6]
 Federal Parole Practices at 2; Grayson, 438 U.S. at 45-46, 98 S.Ct. at 2613
 
 
 [7]
 In 1978, the Supreme Court observed that "[t]he evolutionary development of sentencing and incarceration practices continues to engage attention. Increasingly, there are doubts concerning the validity of the earlier, uncritical acceptance of the rehabilitation model." United States v. Grayson, 438 U.S. at 47 n. 6, 98 S.Ct. at 2614 n. 6 (citations omitted). Subsequently, the Court, while conceding that "[n]o ideal, error-free way to make parole-release decisions has been developed," insisted that,
 [i]t is important that we not overlook the ultimate purpose of parole which is a component of the long range objective of rehabilitation. The fact that anticipations and hopes for rehabilitation programs have fallen far short of expectations of a generation ago need not lead states to abandon hopes for those objectives.... The objective of rehabilitating convicted persons to be useful, law-abiding members of society can remain a goal no matter how disappointing the progress.
 Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 13, 99 S.Ct. 2100, 2107, 60 L.Ed.2d 668 (1979).
 
 
 [8]
 The Parole Board's guidelines for parole release consideration set out customary prison terms for a list of offenses. The terms vary in duration, according to both the severity of the offense and the attributes of the offender, including employment history and prior criminal records. See Forman I, 709 F.2d at 854 n. 5
 
 
 [9]
 Pub.L. No. 98-473, Sec. 218(a)(5), 1984 U.S.Code Cong. & Ad.News (98 Stat.) at 2027. Current parole laws, 18 U.S.C. ch. 311 (1982), are to remain in effect for five years after the Sentencing Reform Act's effective date. Pub.L. No. 98-473, Sec. 235(b)(1)(A), 1984 U.S.Code Cong. & Ad.News (98 Stat.) at 2032. See S.Rep. No. 225, 98th Cong., 1st Sess. 189, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3372. For discussion of Congress' reasons for not retaining the Parole Commission, see S.Rep. at 52-58, 164-165; 1984 U.S.Code Cong. & Ad.News at 3236-3241, 3347-3348
 
 
 [10]
 The Conference Report stated that parole serves various objectives of the correctional system: "[i]n the first instance, parole has the practical effect of balancing differences in sentencing policies and practices between judges and courts.... In performing this function, the parole authority must have in mind some notion of the appropriate range of time for an offense which will satisfy the legitimate needs of society to hold the offender accountable for his own acts." Conference Report at 19; 1976 U.S.Code Cong. & Ad.News at 352
 
 
 [11]
 The primary reason for the 1984 parole reforms was the failure of the previous reforms, including the PCRA, to eliminate disparities in the prison terms of similar offenders:
 Even two such offenders who are sentenced to terms of imprisonment for similar offenses may receive widely differing prison release dates....
 These disparities ... can be traced directly to the unfettered discretion the law confers on those judges and parole authorities responsible for imposing and implementing the sentence. This sweeping discretion flows from the lack of any statutory guidance or review procedures to which courts and parole boards might look.
 S.Rep. No. 225, 98th Cong., 1st Sess. 38 (1983), reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3221 (emphasis added) (footnote omitted).
 The Committee also pointed out that, in part because "the parole guidelines frequently fail in practice to achieve their goal of reducing unwarranted sentencing disparities," S.Rep. No. 225 at 48; 1984 U.S.Code Cong. & Ad.News at 3231, the Parole Commission's efforts in this direction "unfortunately contribute to a second grave defect of present law: no one is ever certain how much time a particular offender will serve if he is sentenced to prison." S.Rep. No. 225 at 49; 1984 U.S.Code Cong. & Ad.News at 3232. The Congress clearly does not view the Parole Commission guidelines as having the force and effect of laws.
 
 
 [12]
 One problem with Forman I 's "substantial flexibility" test is that it does not recognize that conformity with the guidelines may be the consequence, not the cause, of individual decisions, as guidelines are revised to reflect actual practice. Cf. Benedict v. United States Parole Commission, 569 F.Supp. 438, 444 (E.D.Mi.1983)