**Leon FARUQ, et al.**

v.

**Elmanus HERNDON, et al.**

**Civ. No. K–88–2951.**

United States District Court,
D. Maryland.

Sept. 28, 1993.

---

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs in the within class action are all inmates in the custody of the Maryland Division of Correction (DOC) whose offenses were committed prior to January 18, 1988. They challenge the application to them of a new security classification system, effective January 18, 1988, which they claim makes it more difficult than did preceding classification systems for plaintiffs to progress through the correctional system to lesser security levels and work-release, thereby delaying or denying them release on parole, in violation of the *ex post facto* clause of the United States Constitution. U.S. CONST. art. I, § 10, cl. 1. The new system is set forth in Division of Correction Regulation (DCR) 100-1 (effective January 18, 1988, and revised effective July 1, 1991), which describes the classification process, and DCR 155-2 (effective April 1, 1991), which establishes eligibility criteria for work-release.

Plaintiffs consist of three classes. Class A includes all inmates in the custody of the DOC serving life sentences for offenses committed prior to January 18, 1988.[1] Class B consists of all inmates in the custody of the DOC serving non-life sentences of 30 years or more for offenses committed prior to January 18, 1988.[2] Class C encompasses all inmates in DOC custody who were affected by the decision in *Green v. Hughes,* Civ. No. Y-81-1841 (D.Md. June 9, 1982).[3] Plaintiffs

Frances E. Kessler, Baltimore, MD, for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of Maryland, and Stephanie Lane–Weber, Asst. Atty. Gen. of Maryland, for defendants.

1. Named plaintiffs Leon Faruq, Liston Noble, Dorian Maddox, Charles Brent, Timothy W. Knode, and Thomas E. Saul represent this class.

2. Class B is represented by named plaintiffs David Sumrall, Orvell (Winston) Lloyd, Fred Graves, and Nathaniel Johnson.

3. Named plaintiffs Leon Faruq, Fred Graves, and Nathaniel Johnson are the class representatives of Class C.

In *Green v. Hughes,* in an opinion adopted by Judge Young, then Magistrate Judge Smalkin held that the revisions of DCRs 100-14 and 100-3, effective June 15, 1981, did not violate the *ex post facto* clause, except as to a certain class of inmates. The revised DCR 100-14 "established certain categories of prisoners who [we]re absolutely ineligible for pre-release custody classification," including inmates with a conviction for

rape and/or a first, second, or third-degree sexual offense; inmates who, while on pre-release status, committed serious offenses; and inmates who had a history of two escapes or attempted escapes during their current sentences, or within seven years. *Green v. Hughes,* Civil No. Y-81-1841, slip op. at 1 (D.Md. June 9, 1982). The revised DCR 100-3 barred "two-time escapers [sic], as well as persons who committed serious offenses [while] previously on minimum security status, from being assigned or re-assigned to minimum security." *Id.* at 2. Plaintiffs in *Green v. Hughes* argued that so precluding such inmates from attaining pre-release and/or minimum security status inevitably would lead to an increase in their sentences, since the Maryland Parole Commission considers "the progress of the inmate during his confinement" and, plaintiffs argued, progression into minimum and pre-release security status is essential to so finding

sue under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202,[4] seeking declaratory,[5] injunctive,[6] and monetary relief[7] against the Secretary of the Department of Public Safety and Correctional Services, officials of the DOC, and officials of the Maryland Parole Commission.[8]

such progress. The *Green v. Hughes* plaintiffs, therefore, argued that the application to them of the June 15, 1981, revisions violated the *ex post facto* clause, as such revisions were applied to them retrospectively and as such application disadvantaged the *Green v. Hughes* plaintiffs by making parole more difficult to obtain.

The court, however, found that, while progression to lower security levels was one way of demonstrating "progress during confinement," progress also could be shown in other ways, for example, by an inmate completing educational or rehabilitation programs. However, based on the testimony of two parole commissioners that "an assignment to pre-release or minimum security custody would be crucial to determining whether an inmate without a previous work history could successfully adjust to life outside prison," the court determined that for inmates without a previous work history, who were prohibited from attaining pre-release or minimum security status under the revisions, parole had been made more difficult, thereby lengthening their time in prison. *Id.* at 6. Therefore, with regard only to prisoners without previous work histories, the court held that the revisions violated the *ex post facto* clause. *Id.*

*Green v. Hughes* inmates came to be defined as persons received into the custody of the DOC before June 15, 1981, who did not have a history of work, i.e., licit employment, including self-employment, military service, or work release, with one or more employers, for a period equal to six months or more of full-time work. DCR 100–3 (effective November 1, 1983), §§ IV.I and J, V.A. Prior to January 18, 1988, therefore, the DOC utilized two different sets of classification regulations. *Green v. Hughes* inmates were classified under the December 1, 1980, versions of DCRs 100–3, 100–14, and 100–19. All other inmates were classified under DCR 100–3 (effective November 1, 1983, rescinding the June 15, 1981, version and all changes to it) and DCR 100–14 (effective June 15, 1981).

4. Plaintiffs premise jurisdiction upon 28 U.S.C. § 1343(a)(3) and (4).

5. Plaintiffs ask this Court to declare the following: 1) that the application of DCR 100–1 (January 18, 1988, and July 1, 1991) to Class A inmates is prohibited by the *ex post facto* clause whenever it makes it more difficult than the preceding classification system for inmates to progress to lesser security and/or work release, thereby delaying or denying them release on parole; 2) that the application of DCR 155–2 (April 1, 1991) to inmates serving life sentences for offenses committed prior to April 1, 1991, is prohibited by the *ex post facto* clause because it makes it "impossible for these inmates to progress to pre-release and work release status and thereby makes it impossible for them to secure parole"; 3) that the application of DCR 100–1 (January 18, 1988, and July 1, 1991) to Class B inmates is prohibited by the *ex post facto* clause because it makes it more difficult than the preceding systems for inmates to progress to lesser security and/or work release, thereby delaying or denying them release on parole; and 4) that the application of DCR 100–1 (January 18, 1988, and July 1, 1991) to Class C inmates is prohibited by the *ex post facto* clause because it makes it more difficult than the pre–1981 regulations for the inmates to progress to lesser security and work release, thereby delaying or denying them release on parole. It is to be noted that, although plaintiffs seek a declaration that the application of DCR 155–2 (April 1, 1991) to inmates serving life sentences for offenses committed prior to April 1, 1991, is prohibited by the *ex post facto* clause, no such class, i.e. inmates serving life sentences for offenses committed prior to *April 1, 1991*, has been certified. In this Court's Order dated June 18, 1992, this Court certified only the three classes delineated *supra*. It appears that plaintiffs desire either to expand Class A or to create a new class encompassing inmates serving life sentences for offenses committed prior to April 1, 1991. However, as no such class has been certified in the within class action, this Court declines to reach the claims of any such inmates.

6. Plaintiffs request that this Court order the defendants to classify all Class A inmates (lifers) and Class B inmates (non-lifers with sentences of 30 years or more) pursuant to DCR 100–3 (November 1, 1983) and DCR 100–14 (June 15, 1981) whenever an inmate can demonstrate that the new classification system makes it more difficult than the preceding classification system for him/her to progress to minimum security and/or pre-release, in the case of Class A inmates, or to lesser security and/or work release, in the case of Class B inmates. Plaintiffs also ask this Court to compel the defendants to classify all Class C inmates (*Green v. Hughes* inmates) pursuant to DCRs 100–3 and 100–14 (December 1, 1980) whenever an inmate can demonstrate that the new classification system makes it more difficult than the preceding classification system for him/her to progress to minimum security and/or work release.

7. Plaintiffs seek reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and costs pursuant to Federal Rule of Civil Procedure 54(d). Plaintiffs also request this Court to award such additional relief as it may deem just and appropriate.

8. Plaintiffs sue in their official capacities defendants Elmanus Herndon, former Acting Commissioner of the DOC; Fred E. Jordan, former Com-

## I. PROCEDURAL HISTORY

This class action was commenced on October 3, 1988. In this case, plaintiffs, in an Amended Complaint, challenge the application to them of a new classification "point system," set forth in DCR 100–1, which went into effect on January 18, 1988, and which plaintiffs claimed made it more difficult than did the preceding classification systems for plaintiffs to progress to minimum security and work release, thereby making it more onerous for plaintiffs to receive parole. This Court signed two orders dated October 14, 1988, certifying two classes pursuant to Federal Civil Rule 23(a). Class A consisted of all inmates in the custody of the DOC serving life sentences for offenses committed before January 18, 1988, for whom DCR 100–1 (January 18, 1988) made it more difficult to progress to lower security and work release and therefore more difficult to attain parole.[9] Class B was similarly defined, except that it consisted of all DOC inmates serving non-life sentences for offenses committed prior to January 18, 1988.[10]

Thereafter, defendants[11] filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment on October 31, 1988. Defendants contended that the action should be dismissed because, they claimed, the Amended Complaint essentially challenged only the fact or duration of the plaintiffs' imprisonment, in which case, an action in habeas corpus, not an action under 42 U.S.C. § 1983, is the exclusive remedy. *See Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Defendants further argued that as the pursuit of a habeas corpus action in federal court requires the exhaustion of adequate and available state remedies, and as plaintiffs did not exhaust their state remedies, the action should be dismissed. In the alternative, defendants asserted that they were entitled to summary judgment on plaintiffs' *ex post facto* claims, arguing that DCR 100–1 (January 18, 1988) was not a "law" under the *ex post facto* clause and that it did not disadvantage plaintiffs.

Subsequently, plaintiffs filed an Opposition to Defendants' Motion to Dismiss on November 28, 1988, arguing that *Preiser* does not control and that an action under 42 U.S.C. § 1983 is proper, as the relief they seek is not release but, rather, classification pursuant to the previously promulgated guidelines. Defendants filed on March 20, 1989, a Supplemental Memorandum of Fact and Law in Support of Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and on April 21, 1989, plaintiffs filed an Opposition to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, contending that the application to them of DCR 100–1 not only violated the *ex post facto* clause, but also was inconsistent with a Maryland statute, MD.CODE ANN. Art. 41, § 4–516 (1990).[12] Defendants re-

---

missioner of the DOC; Richard Lanham, Commissioner of the DOC; Warren Sparrow and Arthur Crawmer, Directors of Classification of the DOC; Bishop Robinson, Secretary of the Department of Public Safety and Correctional Services; and Marjorie Jennings, Dan Zaccagnini, John W. Wolfgang, Harry Traurig, Frank Pappas, and Maceo Williams, Maryland Parole Commissioners.

9. *See* note 1, *supra.*

10. *See* note 2, *supra.* The Amended Complaint also named Terry Carr, Henry P. Jackson, and Hubert Moore as representatives of Class B.

11. *See* note 8, *supra.* The Amended Complaint named as defendants, in their official capacities, Elmanus Herndon, Commissioner of the DOC; Warren Sparrow, Classification Director of the DOC; Bruce Stout, Former Classification Director of the DOC; James Rollins, Warden of the Maryland Penitentiary; John Wilt, Director of the Maryland Pre-release System; Terrie Chavis,

Warden of the Maryland House of Correction; John Brown, Warden of the Maryland Correctional Institution; Eugene Nuth, Warden of MCI–J; Bishop Robinson, Secretary of the Department of Public Safety and Correctional Services; and Marjorie Jennings, Daniel Zachagnini, John W. Wolfgang, Harry Traurig, Frank Pappas, and Maceo Williams, Maryland Parole Commissioners.

12. MD.CODE ANN. Art. 41, § 4–516 provides in pertinent part:

(c)(1) ... a person who has been sentenced to life imprisonment is not eligible for parole consideration until the person has served 15 years or the equal of 15 years when considering the allowances for diminution of period of confinement provided for in Article 27, § 700 and Article 27, § 638C, of the Code.

(2) A person who has been sentenced to life imprisonment as a result of a proceeding under Article 27, § 413 is not eligible for parole

sponded on May 3, 1989, with their Reply, expanding upon their arguments that DCR 100–1 (January 18, 1988) does not violate the *ex post facto* clause and maintaining 1) that DCR 100–1 (January 18, 1988) was consistent with MD.CODE ANN. Art. 41, § 4–516, and 2) that the state-law claim of plaintiffs should be dismissed under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

This Court held a hearing on May 19, 1989, during which it held *sub curia* Defendants' Motion to Dismiss on the habeas corpus ground. During that hearing, plaintiffs orally moved for partial summary judgment in connection with that issue, and this Court received that oral motion. Therefore, there are currently pending cross-motions for summary judgment on the habeas corpus issue.

Also during the May 19, 1989, hearing, defendants withdrew their motion for summary judgment with regard to the *ex post facto* issue and agreed with plaintiffs to present that issue for determination of facts and law by this Court on the basis of the record as it presently existed, subject to certain supplementary materials to be presented to this Court the following month. In that light, plaintiffs refrained from filing a cross-motion for summary judgment with regard to the *ex post facto* issue. The parties also stated during the May 19, 1989, hearing that they were pursuing the possibility of entering into a consent decree.

On June 23, 1989, plaintiffs and defendants filed supplementary memoranda of facts and law with regard to the *ex post facto* issue. Defendants also submitted a proposed consent decree relating only to Class B, that is, to those plaintiffs serving non-life sentences. With regard to Class A inmates, the parties were content to abide by the arrangement agreed upon during the May 19, 1989 hearing. Ultimately, however, the proposed agreement was never approved by plaintiffs. Plaintiffs and defendants participated in numerous negotiation sessions concerning the

revision of DCR 100–1. The revised DCR 100–1 was promulgated on July 1, 1991. Related to this, a new regulation on work release, DCR 155–2, was adopted on April 1, 1991. Plaintiffs agreed that the revised regulation was, in many respects, an improvement over the 1988 classification system. However, several groups of inmates still believed that they were disadvantaged by the 1991 regulation and wished to pursue their claims.

Plaintiffs filed their Second Amended Complaint on May 29, 1992, challenging the application to them of DCRs 100–1 (January 18, 1988 and July 1, 1991) and 155–2 (April 1, 1991). They also submitted a Motion to Amend Class Certification. This Court signed an Order granting plaintiffs' Motion to Amend Class Certification and certifying the three classes delineated, *supra,* i.e., Class A, consisting of DOC inmates serving life sentences for offenses committed prior to January 18, 1988; Class B, consisting of DOC inmates serving non-life sentences of 30 years or more for offenses committed prior to January 18, 1988; and Class C, encompassing DOC inmates affected by the decision in *Green v. Hughes.* Defendants filed their Answer on June 22, 1992, and on October 2, 1992, they filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, preserving all their arguments made in previous pleadings. Plaintiffs filed a Motion for Summary Judgment on November 25, 1992, similarly incorporating the arguments made in their previously filed memoranda.

## II. FACTUAL BACKGROUND

### A. The New Classification System

Pursuant to the authority of the Commissioner of the DOC to "adopt and promulgate reasonable rules and regulations," which "may be altered, amended or abrogated" by him, MD.ANN.CODE Art. 27, § 676 (1992), DCRs 100–1 (January 18, 1988 and July 1, 1991) and 155–2 (April 1, 1991) were promul-

---

consideration until the person has served 25 years or the equal of 25 years when considering the allowances for diminution of period of confinement provided for in Article 27, § 700 and Article 27, § 638C, of the Code.

Plaintiffs contend that DCR 100–1 is inconsistent with § 4–516 as it, so they claim, extends a lifer's ineligibility for parole beyond the eligibility "date" set by § 4–516.

gated. This new classification system utilizes an objective point system to determine both an inmate's initial security classification and any reclassifications. Within the DOC, there are four security levels: maximum, medium, minimum, and pre-release.[13] Under the DCR, a classification team utilizes the initial classification instrument to arrive at an inmate's security score, which is based upon the totality of points assigned to certain factors, namely, severity of offense, sentence length, detainers, pending charges, warrants, prior incarcerations, history of escape, and history of violence.[14] *See* DCR 100–1 (July 1, 1991) App. 3. Based upon an inmate's security score, the instrument recommends assignment to a certain security level. However, the DCR provides that the classification team may override the instrument's recommendation. The warden or a designee must accept or reject the recommendation of the classification team in its entirety. *See* DCR 100–1 (July 1, 1991) VI.C.2. Under the DCR, an inmate serving a life sentence must be classified initially to maximum security. *See* DCR 100–1 (July 1, 1991) V.E.1.b. For inmates serving a sentence of 30 years or more, the instrument recommends initial classification to no less than medium security. *See* DCR 100–1 (July 1, 1991) App. 3.

Inmates in maximum, medium, or pre-release security are reclassified every twelve months. Inmates in minimum security are reclassified every six months, with certain exceptions. *See* DCR 100–1 (July 1, 1991) V.E.1.f.(1). At reclassification, in addition to a computation of an inmate's security score, his or her institutional score is computed.[15] The institutional score is based upon the totality of points assigned to the following factors: time served, institutional disciplinary record (time since last infraction, seriousness and frequency of infractions), substance abuse, and job and program participation.[16] *See* DCR 100–1 (July 1, 1991) App. 5. Based

upon the institutional score, the reclassification instrument recommends an increase, decrease, or no change in the inmate's security level. In order for the reclassification instrument to recommend a decrease in security, the inmate must have at least 24 points. *See* DCR 100–1 (July 1, 1991) App. 5, § 15. However, the maximum number of points which can be earned for the components of the institutional score, other than points awarded for time served, is 22. Therefore, for the instrument to recommend a decrease in security, an inmate must earn at least two points for time served. For an inmate with a security score of 12 or more, which includes any inmate with a sentence of 30 years or more, all of this means that he or she must serve at least 25% of his or her sentence in order to earn the two points necessary to earn a decrease under the instrument. *Id.* at § 8.b. In order for an inmate serving a life sentence to earn sufficient points for the instrument to recommend a decrease, he or she must be statutorily eligible for parole consideration.[17] *Id.* at § 8.c. At any rate, inmates serving life sentences, initially classified to maximum security, cannot be classified below medium security unless they have had a parole hearing at which they are recommended for work-release and they are within 24 months of a parole rehearing. *See* DCR 100–1 (July 1, 1991) App. 5. Again, however, the classification team may override the instrument's recommendation, subject to the warden's approval. *See* DCR 100–1 (July 1, 1991) VI.C.2.

Under the 1988 DCR, overrides in initial classifications at the Maryland Reception Diagnostic & Classification Center (MRDCC) occurred in 26% of the cases, and at the Maryland Correctional Institution for Women (MCIW), overrides occurred in 13% of the cases. In field testing of the initial classification instrument of the 1991 DCR, overrides

---

**13.** DCR 100–1 (January 18, 1988) provided for custody levels with the security levels. However, the 1991 revision eliminated the custody levels.

**14.** The 1988 version did not factor pending charges or warrants.

**15.** Under the 1988 version, the institutional score was named the custody score.

**16.** The 1988 version also considered as a factor responsibility demonstrated.

**17.** *See* note 12, *supra,* for the text of the statute describing parole eligibility for inmates serving life sentences.

occurred in 1% of the cases at MRDCC and in 10% of the cases at MCIW. Overrides in reclassification decisions under the 1988 DCR occurred in 30–35% of all cases. During field testing under the 1991 DCR, overrides occurred in approximately 17.9% of reclassifications. The goal in revising the 1988 DCR was to have an override rate of 15% or less. Report on the Revision of DCR 100–1 (April 4, 1991), Ex. 1A to Defs.' Mot. to Dismiss, or in the Alternative, Mot. for Summ. J. (October 2, 1992), at 2, 6–8.

Under DCR 100–1 (January 18, 1988, and July 1, 1991), no inmate (other than those statutorily or judicially never eligible for parole, e.g., those serving life without parole sentences) is categorically ineligible ever to attain minimum or pre-release status.

DCR 155–2 (April 1, 1991), setting forth eligibility criteria for work release, states that "assignment to work release is a *privilege*," that "an inmate has no right to consideration for or assignment to work release," and that "an inmate's work release status may be revoked, suspended or cancelled at any time in accordance with Division of Correction regulations." DCR 155–2 (April 1, 1991) § V.A. Under DCR 155–2 (April 1, 1991), inmates serving life sentences may be considered for work release if they statutorily are eligible for parole consideration, they "have had a parole hearing on or after February 1, 1991 at which the Parole Commission has explicitly recommended that the inmate be considered for work release[,] ... the Parole Commission has scheduled a parole rehearing date at the same time it explicitly recommended work release," and the inmates meet all other eligibility criteria applicable to non-lifers. *Id.* at § V.D.2. To be eligible for work release under DCR 155–2

(April 1, 1991), inmates serving life sentences and those serving sentences of 30 years or more must have been on pre-release for at least 30 days, must be within 12 months of an anticipated release date,[18] and must meet certain other prerequisites, such as completing a substance abuse program if recommended for treatment and completing an employment readiness program under certain circumstances. *Id.* at § V.D.

## B. Previous Classification Regulations

Plaintiffs compare the instrument recommendations under DCR 100–1 (January 18, 1988 and July 1, 1991) with possible results under the previous regulations for the plaintiff classes. Previously, Class C inmates (*Green v. Hughes* inmates) were classified under the December 1, 1980, versions of DCRs 100–3, 100–14, and 100–19. Because a *Green v. Hughes* inmate is, by definition, one who was received in custody prior to June 15, 1981, the issue of initial classification only arises in those cases where the inmate was released on parole and returned to DOC custody after having been found to have violated his or her parole. The reclassification procedure, however, affects all *Green v. Hughes* inmates. DCR 100–3 (December 1, 1980),[19] regulating classification to minimum security, only limited assignment to minimum security if an inmate had a history of escape. The classification regime applicable to *Green v. Hughes* inmates considered an inmate's escape history in two ways. First, under DCR 100–3 (December 1, 1980), an inmate who escaped from the DOC and subsequently was convicted of a new offense committed while at large was not eligible for minimum

---

**18.** DCR 155–2 (April 1, 1991) provides in pertinent part:

*Estimated Release Date* means:

A. For inmates serving sentences other than life, the mandatory supervision release date, expiration of sentence date, MAP release date, delayed parole release date or any scheduled parole hearing date that is likely to result in approval for parole.

B. For eligible inmates serving life sentences, an estimated release date is a scheduled parole rehearing date that was established at a parole hearing on or after February 1, 1991 at which

the Parole Commission explicitly recommended that the inmate be considered for work release.

DCR 155–2 (April 1, 1991) § IV.A. and B. "MAP" stands for "Mutual Agreement Programming."

**19.** DCR 100–3 (December 1, 1980) only established divisionwide minimum security criteria. However, it provided for the individualized development of additional criteria by the managers of each institution because of the differences among the institutions.

security for two years from the date of his or her return. An inmate who escaped but was not convicted of a new offense was not eligible for minimum security for one year from the date of his or her return.[20] *See* DCR 100–3 (December 1, 1980) § IV.A.1. Second, the classification team would complete the Escape Screening Worksheet, DCR 100–19 (December 1, 1980), App. 1. Under this worksheet, inmates whose present commitment included a conviction for escape were rated as high to very high risk, depending upon whether they had any prior escapes or attempted escapes. Inmates whose present commitment did not include a conviction for escape were rated as low to medium risk, depending upon whether they had any prior escapes or attempted escapes. DCR 100–3 (December 1, 1980) provided that any inmate eligible for classification to minimum security who was rated as low to medium risk, i.e., all of those who did not have a present commitment that included a conviction for escape, would be expected to be recommended for minimum security, unless the classification team recommended against minimum security classification because of exceptional circumstances. *See* DCR 100–3 (December 1, 1980), § IV.B.2.a. Plaintiffs point out that, by contrast, under DCR 100–1 (July 1, 1991), the classification instrument recommends that all inmates with 12 to 30 points on their security assessment be assigned to medium security, and those with over 31 points be assigned to maximum security, regardless of whether they have any escape history. *See* DCR 100–1 (July 1, 1991) App. 3, § 8. An inmate can receive 12 or more points for either the severity of his or her offense or the length of his or her sentence alone.[21] Plaintiffs also note that, as explained, *supra,* as to reclassification under DCR 100–1 (July 1, 1991), the instrument will not recommend a decrease in security for inmates serving sentences of 30 years or more until they have served at least 25% of their sentences.[22]

Under DCR 100–14 (December 1, 1980), which regulated eligibility for pre-release assignment, inmates with sentences greater than ten years were required to have had their first parole hearing or to have served ten years of their sentence, whichever came first, in order to be eligible for pre-release assignment. *See* DCR 100–14 (December 1, 1980) § IV.A.1.a. Inmates with certain outstanding detainers[23] and those who had been found guilty of a major infraction within the past 60 days were ineligible for pre-release assignment. DCR 100–14 (December 1, 1980) § IV.A.1.b. and c.(1). Also, inmates who escaped and were apprehended and convicted of a new offense committed while escaped were ineligible for pre-release for two years. Inmates who escaped and were apprehended without being found guilty of a

20. There was provision for a procedure whereby the Commissioner could make exceptions to this policy.

21. Therefore, plaintiffs argue that many inmates, who under DCR 100–3 (December 1, 1980) were recommended for minimum security, are recommended for medium or maximum security under DCR 100–1 (July 1, 1991). Such a conclusion, however, cannot be drawn from the mere facts recited, *supra.* Plaintiffs have failed to consider that DCR 100–3 (December 1, 1980) set only division-wide criteria for eligibility to minimum security, leaving individual institutions free to develop additional criteria suited to their populations and facilities. *See* DCR 100–3 (December 1, 1980) § IV.A.2. Without considering such additional institutional criteria, the conclusion drawn by plaintiffs is not compelled.

22. As to reclassification, plaintiffs contend that DCR 100–1 (July 1, 1991) disadvantages *Green v. Hughes* inmates who at the time it went into effect had not yet served 25% of their sentences,

i.e., any inmate with a sentence of more than 40 years. Plaintiffs estimate that the number of possible *Green v. Hughes* inmates serving non-life sentences of 40 years or more may be as high as 203. Plaintiffs assert that DCR 100–1 (July 1, 1991) disadvantages such inmates because, under it, the instrument would not recommend a decrease in security until they have served 25% of their sentence, whereas, plaintiffs argue, the 1980 regulation would recommend immediately a decrease to minimum unless the prisoner's current commitment included a conviction for escape. However, as explained, *supra,* in note 19, such a conclusion is not required, as it fails to take into account the additional criteria, if any, established by the individual institutions.

23. Detainers for payable fines, domestic matters, jail sentences of six months or less, traffic offenses, concurrent federal sentences, or from a jurisdiction which consented to pre-release status, did not preclude eligibility for pre-release. DCR 100–14 (December 1, 1980) § IV.A.1.b.(2).

new offense committed while at large were ineligible for pre-release for one year.[24] *Id.* at § IV.A.1.c.(2). DCR 100–14 (December 1, 1980) provided that any inmate eligible for classification to pre-release rated as low to medium risk pursuant to the Escape Screening Worksheet of DCR 100–19 (December 1, 1980), i.e., all of those who did not have a present commitment including a conviction for escape, would be expected to be recommended for pre-release, unless the classification team recommended against pre-release security classification because of exceptional circumstances. DCR 100–14 (December 1, 1980) § IV.B. Thus, under the 1980 regulation, an inmate whose sentence was over ten years, whose present commitment did not involve a conviction for escape, who had no major infractions within 60 days, who did not escape, and who had no detainers precluding

eligibility, could conceivably be considered for pre-release after serving no more than ten years.[25]

Prior to January 18, 1988, non-*Green v. Hughes* inmates were classified under DCRs 100–3 (November 1, 1983) and 100–14 (June 15, 1981). Under DCR 100–3 (November 1, 1983), which regulated classification to minimum security, classification teams considering certain categories of inmates, including those serving life sentences, were required to review a psychological and/or psychiatric evaluation of such inmates, which addressed their suitability for minimum/pre-release security. DCR 100–3 (November 1, 1983) § VI.B.7. DCR 100–3 (November 1, 1983) also provided that the decision to reclassify a lifer to minimum security be approved by the Commissioner or his or her designee. *Id.* at § VI.C.

---

**24.** There was provision for a procedure whereby the Commissioner could make exceptions to this policy.

**25.** Plaintiffs contrast this possibility, which they characterize in more certain terms, with the possible results under DCR 100–1 (July 1, 1991). Plaintiffs claim an inmate serving a sentence of 40 years or more initially would be classified to maximum or medium security. He or she could not earn sufficient points for the instrument to recommend a decrease in security until he or she had served 25% of his or her sentence, i.e., more than ten years. If decreased to medium, the inmate would not be reclassified for one year. Then, assuming there was no change in circumstances to alter his her score, the reclassification instrument would recommend a decrease to minimum. If decreased to minimum, the inmate would not be reclassified for six months, at which time, again assuming no change in circumstances which would alter his or her score, the instrument would recommend a decrease to pre-release. Thus, plaintiffs conclude, under the 1991 regulation, a *Green v. Hughes* inmate serving a sentence of 40 years or more would serve either a year and six months plus one-quarter of the amount by which his or her sentence exceeds 40 years *or* six months plus one-quarter of the amount by which his or her sentence exceeds 40 years longer before being recommended for pre-release than under the 1980 regulations.

Plaintiffs also conclude that *Green v. Hughes* inmates serving life sentences are disadvantaged by the 1991 regulation. They again argue that under DCR 100–3 (December 1, 1980), a lifer, as long as he or she did not have a current conviction for escape, would be immediately recommended for minimum security, and, under DCR 100–14 (December 1, 1980), would be recom-

mended for pre-release after ten years. They contrast this with the initial classification and reclassification instruments of DCR 100–1 (July 1, 1991), under which a lifer is initially assigned to maximum security and under which a lifer may not be decreased to medium security until he or she is statutorily eligible for parole. An inmate serving a life sentence is not eligible for parole until the person has served 15 years or the equivalent when considering the allowances for diminution of period of confinement for good-time credits. MD.CODE ANN. Art. 41, § 4–516 (1990). (In 1987, a provision was added requiring that a person serving a life sentence for first degree murder, for which the death penalty may be sought, is not eligible for parole until the person has served 25 years or the equivalent when considering the allowances for diminution of period of confinement for good-time credits. However, plaintiffs agree that this provision has not been applied to persons whose offenses were committed before its effective date, and thus that it has no effect on *Green v. Hughes* inmates.) Plaintiffs assert the earliest an inmate serving a life sentence may be considered for parole is after serving approximately 11½ years. They add to this a year for reclassification from medium to minimum and six months for reclassification to pre-release, yielding a minimum of at least 13 years before a lifer, in ideal circumstances, may be classified to pre-release security under the 1991 classification instruments, as opposed to ten years under the 1980 regulations. Again, however, in so asserting, plaintiffs fail to consider the individual institutional criteria, if any, allowed by DCR 100–3 (December 1, 1980), and they do not consider the provision for overrides in the 1991 regulation. *See* DCR 100–1 (July 1, 1991) § VI.C.2.

DCR 100–14 (June 15, 1981), regulating classification to pre-release, required that a person serving a life sentence be within 12 months of a scheduled parole rehearing date in order to be eligible for consideration for pre-release security. DCR 100–14 (June 15, 1981) § IV.C.2.b. Before pre-release security for a particular inmate could be implemented, the Commissioner or his or her designee had to approve such a move. *Id.* In addition, DCR 100–14 (June 15, 1981) excluded from eligibility for pre-release all inmates with a present or prior conviction for rape or for a first, second, or third degree sex offense, whether they were serving life or non-life sentences. *Id.* at § IV.C.1.c.(1). Plaintiffs note that, by contrast, under the 1991 regulation, lifers are not eligible to be classified below medium security unless the Parole Commission specifically has recommended that they be tested on work release and they are within 24 months of a parole rehearing date. Plaintiffs point out that from February, 1991 through September, 1992, out of a total of 329 inmates serving life sentences who had parole hearings, 135 were recommended for work release.

Under DCR 100–3 (November 1, 1983), those inmates serving non-life sentences who might become eligible for pre-release were eligible to be considered for minimum security when they were within 24 months of an anticipated release date. An inmate serving a non-life sentence who would never become eligible for pre-release was eligible to be considered for minimum security when within 18 months of an anticipated release date. An anticipated release date was defined as a mandatory release date, a Mutual Agreement Programming (MAP) release date, a delayed parole release date, a parole progress review, or a parole rehearing that reasonably could be expected to result in parole. DCR 100–3 (November 3, 1983) §§ IV.D. and VI.B.2.a.(1) and (2). Under DCR 100–14 (June 15, 1981), an inmate was eligible for pre-release when he or she was within 12 months of a current mandatory release date, a pre-determined parole release date, or a parole hearing that is likely to result in approval for parole.

DCR 100–14 (June 15, 1981) § IV.C.2. Plaintiffs assert that these regulations operated to allow prisoners to show progress during confinement by moving to minimum or pre-release security prior to being considered for parole, and they further contend that the new classification system does not similarly allow inmates with sentences of 30 years or more to show progress during confinement until after they have initially been considered for parole.

## C. The Connection to Release on Parole

Plaintiffs agree that for their *ex post facto* challenge to the new classification system to succeed, they must show that they are disadvantaged by it in comparison to the preceding systems. They attempt to do this by arguing that the new classification system delays their progression to lower security levels and work release, from which, they claim, they are more likely to be paroled. Thus, plaintiffs concede that to succeed, they must demonstrate a nexus between the operation of DCRs 100–1 (January 18, 1988, and July 1, 1991) and 155–2 (April 1, 1991) and a delay in their parole release dates. They must show that release on parole is tied inextricably to progression to lower security levels and work release.

The Parole Commission, after such investigation as would enable it "to determine the advisability of granting parole," MD.ANN. CODE Art. 41, § 4–516 (1990), decides whether or not to parole inmates serving non-life sentences.[26] *Id.* at § 4–504. As to inmates serving life sentences, the Parole Commission makes recommendations as to parole to the Governor, upon whose approval the grant of parole depends. *Id.* at § 4–516(b)(4).

Inmates are statutorily eligible for parole at any time if serving a non-life sentence, and after 15 or 25 years or the equivalent, considering certain "good time" and similar credits, if serving a life sentence. *Id.* at 4–504, 4–516. Under Maryland law, any hearing ex-

---

**26.** Maryland law does require that the Parole Commission request a DOC investigation to enable it to determine the advisability of granting parole whenever a non-lifer has served one-fourth of his or her sentence. MD.ANN.CODE Art. 41, § 4–516(a) (1990).

aminer or Parole Commission member determining whether an inmate is suitable for parole is to consider certain factors, including "the progress of the inmate during his confinement." *Id.* at § 4–506. Parole Commission Policy 2–1 details the factors to be considered in evaluating institutional progress. At a parole hearing, both institutional adjustment, including history of infractions, and institutional program participation are considered. One factor to be considered under institutional program participation is "the desirability or need for community experience or gradual reintegration into the community prior to parole." Parole Commission Policy 2–1, VII.B.

Plaintiffs claim that for lifers and non-lifers serving sentences of 30 years or more, the achievement of work release status is essential to their showing progress during confinement and that, in fact, two to three years on work release is a prerequisite to being paroled. They note the deposition testimony of defendant parole commissioners Marjorie Jennings and Maceo Williams.

27. Marjorie Jennings testified, in pertinent part:

A. The Commission certainly on any life case would like to see gradual progress, satisfactory adjustment at various levels, security levels, and eventually work release, family leaves. The chief executive makes the decision as to parole, the Parole Commission can only recommend.

Q. You mean the Governor is the one who determines whether there should be a parole?

A. That is right.

Q. And it is the Governor's policy, is it not, that for lifers that he requires that the lifer serve or be tested in pre-release and work release?

A. That was the former governor's policy.

Q. Governor Hughes?

A. Yes, but we don't have any clearly articulated policy presently.

Q. Is it the Parole Commission's policy, though, to require that lifers be tested in pre-release and work release before they would make a recommendation to the Governor?

A. Usually it is.

Q. An are there exceptions?

A. There may be some exceptions by virtue of the age of the offender, the physical health of the offender.

Q. Would those factors cause you to make a recommendation for parole at an earlier stage than otherwise?

A. No, not an earlier stage than otherwise, but absent any type of work release, pre-release, this is what I was referring to. And

there have been lifers released who could not get pre-release or work release.

Q. They have been paroled who were not able to get pre-release or work release?

A. Yes.

Dep. of Marjorie Jennings at 24–26.

28. Maceo Williams testified in pertinent part:

Q. I notice in some, actually in many decisions involving lifers, there is language to the effect that the inmate will need to spend a significant period of time on work release before a recommendation is made to the Governor.

A. Uh-huh.

Q. Is that—

A. That is true. A testing, kind of a testing period, being aware that the Department of Corrections perhaps has a problem with that many, many times because of them not wanting a person in pre-release a long period of time. I understand that, but we still would like to see that person, and here again, we are making a decision based on what we think is best, to see that person tested in a work release kind of situation first for an extended period of time.

Q. And what would you consider an extended period of time?

A. Well, here again, you have to look at that individual person. Some people, maybe two years would be sufficient. Some others, three.

Dep. of Maceo Williams at 20–21.

Marjorie Jennings testified that the Parole Commission usually likes to see lifers tested in pre-release and work release before making a recommendation of parole to the Governor, but that there are exceptions, including exceptions because of the age and health of the inmate.[27] Dep. of Marjorie Jennings at 24–26. Maceo Williams similarly testified that in the case of some lifers, the Parole Commission would want to see them tested in work release for an extended period of time, such as for two to three years.[28] Dep. of Maceo Williams at 20–21. However, he also stated that not all lifers need to be tested on work release before being paroled, such as inmates who were aged, in poor health, or had good work histories or saleable skills. *Id.* at 26–30.

As to non-lifers serving long sentences, Marjorie Jennings stated that while there is no policy, there are certain categories of such inmates whom a Parole Commissioner might want to see tested on pre-release or work release, including individuals with a poor work history prior to incarceration, individuals whose ability to comply with rules needs

testing, and individuals who have problems with substance abuse.[29] Dep. of M. Jennings at 26–28.

Maceo Williams emphasized individualized determinations on a case-by-case basis. He stressed that while a commissioner may want to see an inmate on work release in certain cases, work release was merely one factor in the parole determination, and a commissioner looked at the whole person and all the circumstances surrounding his or her suitability for parole.[30] Dep. of M. Williams at 5, 6, 9–10.

Both plaintiffs and defendants point to statistics on the lifers actually paroled from the

DOC between fiscal years 1983 and 1989. However, they draw differing conclusions from those statistics. Forty-five lifers were paroled between 1983 and 1989. Of those, it is not known whether three ever participated in work release. Based on the remaining 42 inmates, plaintiffs calculate the average length of time lifers spent on work release before being paroled as 3.64 years. Defendants calculate the same to be only 3.5 years. The discrepancy may be due to the limitations of the statistics, which did not include for many inmates the specific dates on which they were classified to work release. At any rate, the difference of .14 years is negligible and will not affect the determination of the

29. Marjorie Jennings stated in pertinent part:
Q. I asked you just a moment ago to focus on lifers, and let me add inmates who have long or serious criminal records. Is there a requirement—and maybe I better put a figure on it, for 15 years or more—are those inmates required according to the Maryland Parole Commission as part of their recommendation that they be tested in minimum security or pre-release or work release?
A. No, there is no policy.
Q. Is there any length of sentence that would cause a parole hearing officer to require movement into minimum security, pre-release or work release, other than lifers?
A. There is nothing that would require it on every case. I mean, there is no policy that requires that you must do this in every case.
Q. Please tell me what the criteria or factors are that would, where that would enter into a hearing officer's decision to require that an inmate be tested in minimum security, pre-release and work release.
A. There are a number of things. The individual may have been incarcerated for a substantial period of time and had no work history prior to incarceration or a sporadic or poor work history prior to incarceration and the hearing officer or commissioner may want to see them tested in the community, see if they can hold down employment, and competitive community employment rather than institutional employment. There are individuals who need to be tested in terms of their ability to comport themselves to rules and regulations in lesser structuring, to determine whether they are going to be capable of abiding by rules before they are released, because parole rules must be complied with. There are also individuals who may have had a work history but may also have a problem with substance abuse and in lesser structure may resurge back into substance abuse. So there are some categories of individuals the hearing officer or commissioner may want to see tested on pre-release or work release.

Dep. of M. Jennings at 26–28.

30. Maceo Williams related, in pertinent part:
Q. As a general proposition, is it more likely that you would parole an inmate who is on work release as opposed to medium security?
A. It is hard to say because each case is individually assessed and to just make a blanket statement, I would not agree with that. I think that is a case-by-case basis and there are people who have been paroled from a medium security institution that I have participated in personally, and I am certain there will be others, so I couldn't make that kind of blanket statement.

Q. Are there certain types of inmates who you would not parole unless they got to pre-release and work release?
A. Not as a general rule, I wouldn't say that we would put people into a category, no. I would have to look at that specific case and to see whether or not it is a first offender, second offender, whether they have a work record, whether their age in terms of exposure to life experiences, the whole business, so to put them into a category, I wouldn't be able to do that.

Q. Are you more likely to require testing in work release or pre-release if an inmate has a long sentence?
A. Well—
Q. Let's say over 15 years.
A. I think, now, we are just talking generalities now? Not without having all the facts about that individual. That creates a problem, too; you just can't put people into little boxes because of a sentence. You know, we have to look at the whole thing. It is hard for me to try to do that without talking about the specifics of that individual.
Dep. of M. Williams at 5, 6, 9–10.

*ex post facto* challenge. *See* Affidavit of Robert W. Gibson, Jr.

Plaintiffs hail the statistic as support for their claim that lifers must spend two to three years on work release before they will be considered for parole. However, defendants also point out that of the 45 lifers who were granted parole, at least three had no time on work release at all. Further, of those 39 lifers who are known to have been on work release, the range in time on work release varied from seven months to eight years. *Id.* Thus, defendants argue that there is no specific time requirement for work release.

Defendants also point to the statistics of all inmates paroled between February 1, 1988 through April 30, 1989 to show that work release status is not necessary to obtain parole. For the aforementioned period, out of 1625 inmates who were paroled, 60.1% were released from security/custody levels above the work release eligibility level; 39.8% were released from that level. *See* Affidavit of Thomas L. Stough.

### III. HABEAS CORPUS OR § 1983

Defendants contend that this Court should dismiss the within action because, they assert, plaintiffs are truly only challenging the fact or duration of their imprisonment, a challenge which is appropriately brought in the context of a habeas corpus action, rather than an action under 42 U.S.C. § 1983. They aver that the gist of plaintiffs' complaint is not the new classification system per se, but that the application of the new classification system to plaintiffs will extend their time in prison by slowing their progression to lower security levels, and that the Parole Commission will not consider plaintiffs for parole until they have made progress through the system and have proven themselves with some time on pre-release. Therefore, defendants maintain that the crux of plaintiffs' attack is on the duration of their physical confinement, making their sole federal remedy a writ of habeas corpus. They argue further that as the pursuit of a habeas corpus action in federal court requires the exhaustion of adequate and available state remedies, and as plaintiffs did not so exhaust

their state remedies, the action should be dismissed.

Defendants principally rely on the case of *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). In *Preiser*, state prisoners instituted § 1983 actions, coupled with habeas corpus applications, challenging the cancellation of their good time credits for in-prison disciplinary reasons as unconstitutional. They "sought injunctive relief to compel restoration of the credits, which in each case would result in their immediate release from confinement in prison." *Preiser*, 411 U.S. at 476–77, 93 S.Ct. at 1829, 36 L.Ed.2d at 442. The question before the Court was whether state prisoners could maintain an action for such redress pursuant to § 1983, or whether they were limited to the specific federal remedy provided for under 28 U.S.C. § 2254, the federal habeas corpus statute. *Id.* at 477, 93 S.Ct. at 1830, 36 L.Ed.2d at 443. The determination was significant because if a remedy was available under § 1983, the plaintiffs would not have to seek redress in a state court first, whereas, if habeas corpus was the exclusive remedy, the plaintiffs were required, before seeking the intervention of a federal court, to exhaust their state court remedies, where state remedies were available and adequate. *Id.* The Supreme Court held that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate or speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500, 93 S.Ct. at 1841, 36 L.Ed.2d at 456. However, the Supreme Court distinguished cases challenging the conditions of confinement, for which a remedy under § 1983 was allowed. *Id.* at 499, 93 S.Ct. at 1841, 36 L.Ed.2d at 455.

Plaintiffs respond by arguing that they are not challenging the legality of their incarcerations, nor are they requesting immediate or speedier release. Rather, they assert that they are seeking to modify the State's decision-making process. Plaintiffs are not asking this Court to ordain a particular classification result for them. If plaintiffs prevail, the State merely would have to rely

on previous classification regulations, rather than on the new classification system, in classifying DOC inmates. Plaintiffs assert that the ultimate decision on how plaintiffs are to be classified would be left to the DOC. In fact, plaintiffs' Second Amended Complaint supports their position that they are not seeking immediate or speedier release. In their Second Amended Complaint, plaintiffs seek only a declaration that the application of the new classification system to them is violative of the *ex post facto* clause and an injunction enjoining defendants from applying the new system to them and ordering defendants to classify them pursuant to the previous regulations whenever a plaintiff can demonstrate that the new classification system would make it more difficult than its predecessors for him or her to progress to lower security levels and work release. Such a remedy would not mandate immediate or speedier release for any particular plaintiff, but would only mandate that defendants classify the plaintiff pursuant to previous regulations. As plaintiffs note, the ultimate decision in each case would be left to the discretion of government officials.

Post-*Preiser* Supreme Court and circuit case law support holding *Preiser* to its facts, rather than interpreting it broadly. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court determined, in the face of an attack on *Preiser* grounds, that § 1983 was a proper statutory vehicle for state prisoners to challenge the constitutional validity of Nebraska's disciplinary procedures which could result in the forfeiture of good-time credits earned. In *Wolff,* the plaintiff, on behalf of himself and other inmates at a Nebraska prison, brought a § 1983 action, challenging, *inter alia,* that disciplinary proceedings at the prison, which could, in cases of flagrant or serious misconduct, result in the forfeiture of good-time credits earned, violated the Due Process Clause of the Fourteenth Amendment. The plaintiffs sought as relief the restoration of

good-time credits forfeited pursuant to what they alleged was an unconstitutional disciplinary process, the creation of a new disciplinary scheme which would comport with the requirements of the Due Process Clause, and damages. *Wolff,* 418 U.S. at 553, 94 S.Ct. at 2973, 41 L.Ed.2d at 949. The Supreme Court concluded that while the restoration of good-time credits was foreclosed under *Preiser,* a litigant with standing is not precluded by *Preiser* from obtaining a "declaratory judgment as a predicate to a damages award, ... [or] by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid prison regulations." 418 U.S. at 555, 94 S.Ct. at 2974, 41 L.Ed.2d at 950.

The Supreme Court, in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), amplified the *Wolff* gloss on *Preiser,* indicating that the latter applies narrowly to the class of cases in which release or a shortening of the sentence is requested by the petitioner or ordered by the court. In *Gerstein,* a class of Florida prisoners filed a § 1983 class action, claiming a constitutional right to a hearing on probable cause for continued pretrial detention and requesting declaratory and injunctive relief. Justice Powell, writing for the Court, stated:

> Respondents [pretrial detainees] did not ask for release from state custody, even as an alternative remedy. They asked only that the state authorities be ordered to give them a probable cause determination. This was also the only relief that the District Court ordered for the named respondents. [*Pugh v. Rainwater*] 332 F.Supp. 1107, at 1115–1116 (S.D.Fla.1971). Because release was neither asked nor ordered, the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy.

*Gerstein,* 420 U.S. at 107 n. 6, 95 S.Ct. at 859 n. 6, 43 L.Ed.2d at 61 n. 6 (citing *Preiser* and *Wolff*).[31]

---

**31.** A prisoner, however, may not "disguise" what is in reality a challenge to the validity of his or her state court conviction and within the traditional scope of habeas corpus by deliberately omitting a request for immediate release from imprisonment and confining his or her request

for relief to monetary damages and declaratory and injunctive relief, thereby escaping the requirement of exhaustion of state remedies. A court will look to the underlying claim. *See Hamlin v. Warren,* 664 F.2d 29 (4th Cir.1981) (held that a state prisoner who brought a § 1983

Finally, in *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court reached the merits in a § 1983 class action challenging the constitutionality of the procedures of the Nebraska Board of Parole on due-process grounds. Inmates claimed that "they had been unconstitutionally denied parole by the Board of Parole." *Greenholtz*, 442 U.S. at 3–4, 99 S.Ct. at 2102, 60 L.Ed.2d at 673. Although a *Preiser* challenge was not raised, the fact that the Court did not address *sua sponte* the potential jurisdictional bar is support for the inapplicability of *Preiser* to challenges brought to rectify alleged constitutional deficiencies in a prison or parole decision making process, the remedy for which would not necessarily be immediate or speedier release from custody.

Further, the Fourth Circuit, in *Bradford v. Weinstein*, 519 F.2d 728 (4th Cir.1974), *vacated as moot*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), also concluded that "[o]nly such suits as challenge the 'constitutionality of ... physical confinement itself and [seek] either immediate release from that confinement or the shortening of its duration' are subject to the exhaustion requirement" of the habeas corpus statute. *Id.* at 734 (second alteration in original). In *Bradford*, the Fourth Circuit rejected a *Preiser* challenge to two § 1983 class actions alleging the procedures employed by the North Carolina and South Carolina parole boards were constitutionally defective, thus unconstitutionally denying plaintiffs parole. The plaintiffs in that case asserted:

> "The dispute goes only to the manner in which the State judges the prisoner's potential for successful parole; there is no claim that the review process must· or should lead to a specific outcome for a particular prisoner.... While it is doubtless the desire of appellant and others similarly situated to terminate their confinement as soon as possible, the Court is not being asked to rule on the duration of

their confinement.... If appellant prevails in his federal suit, the dates of his release will still depend upon the discretionary judgment of those State officials who pass on the issue of parole."

*Id.* at 730 n. 1 (quoting appellants' brief). The Fourth Circuit, accepting the plaintiffs' disclaimer that the purpose of their suits was not to effect their release or to shorten the duration of their confinement and relying on *Wolff*, held that the plaintiffs could "litigate their due process objections to defendants' parole eligibility proceedings in a suit under 42 U.S.C. § 1983 without the need for exhaustion under 28 U.S.C. § 2254(b)." *Id.* at 734–35.

Other circuits, too, have interpreted the applicability of *Preiser* narrowly. Notably, the Third Circuit, in *Wright v. Cuyler*, 624 F.2d 455 (3rd Cir.1980), rejected a *Preiser* argument in a case in which a Pennsylvania prisoner brought two § 1983 actions alleging that "he was denied due process because his application for home furlough was arbitrarily and capriciously denied," and seeking "compensatory and punitive damages, as well as declaratory and injunctive relief to require the standards for admission to the home furlough program to be applied fairly to him, to require his admission to the program, and to prevent retaliation against him." *Id.* at 456. The court held that "the eligibility or lack of eligibility for temporary home furloughs in Pennsylvania is a condition of one's confinement, which may be challenged directly in a section 1983 action without resort to habeas corpus and its attendant requirement for exhaustion of state remedies." *Id.* at 458 (footnotes omitted). The court noted:

> Wright's demand for fair application of the furlough eligibility criteria, as distinct from his demand for admission to the program, relates to the *manner* by which the prison authorities reach their decision and not the *outcome* of their decision. Thus, this particular claim of Wright's unmistakably goes not to the fact or duration of confine-

---

action alleging that his conviction was the result of a conspiracy and was therefore unconstitutional could not challenge in federal court the validity of his conviction without exhausting his state remedies by confining his request for relief

to monetary damages and declaratory and injunctive relief and by purposely omitting a request for immediate release), *cert. denied*, 455 U.S. 911, 102 S.Ct. 1261, 71 L.Ed.2d 451 (1982).

ment but rather to the fairness of the decisionmaking process. Although impartial application of the furlough criteria to Wright might increase his chance to gain admission to the furlough program, injunctive relief ordering impartial application would not intrude upon or divest the prison administration of its ultimate discretion to grant or deny Wright's admission to the program. The *Preiser* rule is therefore in any event inapplicable.

*Id.* at 458 n. 5.

The *Preiser* rule also was determined to be inapplicable by the D.C. Circuit in *In re United States Parole Comm'n*, 793 F.2d 338 (D.C.Cir.1986), *reh'g granted, vacated*, 798 F.2d 1532 (D.C.Cir.1986). In that case, a federal prisoner challenged the retroactive application to him of a more stringent parole guideline as violative of, *inter alia*, the *ex post facto* clause and requested a court order declaring the guideline invalid and an injunction restraining its enforcement. *Id.* at 340–41. If the prisoner were to prevail on his claim, he possibly could have been "considered for parole under the earlier guidelines, which set a presumptive parole date of 20 to 26 months, instead of 52 to 64, from the date his incarceration began." *Id.* at 341. The Parole Commission argued that *Preiser* relegated the case to habeas corpus because, it argued, the prisoner "[sought] ultimately an earlier parole date . . . [and therefore was] actually challenging the fact or duration of his confinement." *Id.* The D.C. Circuit, however, affirmed that jurisdiction was proper in the district court and that the prisoner was not restricted to habeas corpus but could proceed with his action for declaratory and injunctive relief. The court concluded:

> [*Preiser*] . . . does not bar [the prisoner's] bid for a judgment declaring the guideline in question invalid and an injunction compelling the Commission to disregard it in resetting his parole-eligibility date. This would accomplish no more than an eventual redetermination of his parole-eligibility date in conformity with constitutional and statutory requirements. [The prisoner's] challenge thus is to the manner in which the decision on his eligibility date was reached, and a successful outcome would

not automatically terminate or shorten the period of his confinement. [The prisoner's] prospects for earlier parole may brighten if he prevails, but the time at which he would actually become eligible for parole consideration would remain subject to the Commission's discretion.

*Id.* at 348.

Similarly to *Wright* and *In re United States Parole Comm'n*, in the within case, while plaintiffs argue that the application to them of the previous classification systems would increase their chance of parole, injunctive relief ordering that the previous classification systems be applied to them would not "intrude upon or divest the prison administration of its ultimate discretion" to classify plaintiffs and would not divest the parole commissioners or the governor of their discretion in granting or denying parole. Thus, as the plaintiffs in the within case challenge the manner in which their classifications are decided and have not asked that this Court order their immediate release or shorten their sentences, and as the requested relief would not result necessarily in immediate release or shorter sentences since the ultimate decision on classifications and parole would remain within the judgment of state officials, *Preiser* does not bar this Court from hearing plaintiffs' claims. This case is not of the type that is relegated solely to habeas corpus.

## IV. *EX POST FACTO*

The *Ex Post Facto* clause of the U.S. Constitution provides: "No State shall . . . pass any . . . *ex post facto* law." U.S. Const. Art. I, § 10, cl. 1. "[T]he constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30, 38 (1990) (citing *Calder v. Bull*, 3 U.S. (3 Dall) 386, 390–92, 1 L.Ed. 648 (1798) (opinion of Chase, J.); *id.* at 396, 1 L.Ed. 648 (opinion of Paterson, J.); *id.* at 400, 1 L.Ed. 648 (opinion of Iredell, J.).

In *Calder v. Bull*, 3 U.S. (3 Dall) 386, 1 L.Ed. 648, Justice Chase defined as *ex post facto:*

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender*."

*Id.* at 390, 1 L.Ed. 648, *quoted in Collins*, 497 U.S. at 42, 110 S.Ct. at 2719, 111 L.Ed.2d at 38–39.

The Supreme Court, in *Beazell v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), reiterated:

It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.

*Id.* at 169–170, 46 S.Ct. at 68, 70 L.Ed. 216, *quoted in Collins*, 497 U.S. at 42, 110 S.Ct. at 2719, 111 L.Ed.2d at 39.

In *Collins v. Youngblood, supra,* the Court emphasized that "the prohibition which may not be evaded is the one defined by the *Calder* categories." *Id.* at 46, 110 S.Ct. at 2721, 111 L.Ed.2d at 41. In so doing, Chief Justice Rehnquist overruled two previous decisions which had enlarged the scope of the *ex post facto* clause beyond those categories defined by Justice Chase in *Calder.* Specifically, the Court overruled *Kring v. Missouri,* 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883), and *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898). In *Kring,* the Court had defined an *ex post facto* law, *inter alia,* as one which, " 'in relation to the offense or its consequences, alters the situation of a party to his disadvantage.' " *Collins,* 497 U.S. at 47, 110 S.Ct. at 2721, 111

L.Ed.2d at 42 (quoting *Kring,* 107 U.S. at 228–229, 2 S.Ct. at 449, which quoted *United States v. Hall,* 26 F.Cas. 84, 86 (No. 15,285) (D.Pa.1809)). In *Thompson,* the Court had held that the *ex post facto* clause was violated by a Utah law which decreased the size of criminal juries, thereby depriving the plaintiff of " 'a substantial right involved in his liberty.' " *Collins,* 497 U.S. at 47, 110 S.Ct. at 2721–2722, 111 L.Ed.2d at 42 (quoting *Thompson,* 170 U.S. at 352, 18 S.Ct. at 623).

"[T]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981) (citations and notes omitted). "[A] law need not impair a 'vested right' to violate the *ex post facto* prohibition. . . . [E]ven if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the clause if it is both retrospective and more onerous than the law in effect on the date of the offense." *Id.* at 29–31, 101 S.Ct. at 964–965, 67 L.Ed.2d at 23–24 (notes omitted).

The Supreme Court, while noting that "the distinction between substance and procedure might sometimes prove elusive," *Miller v. Florida,* 482 U.S. 423, 433, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351, 362 (1987), also has stated that for an *ex post facto* violation to occur, the change in law must affect "substantial personal rights," rather than simply "modes of procedure." *Id.* at 430, 107 S.Ct. at 2451, 96 L.Ed.2d at 360 (quoting *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977)). "Hence, *no ex post facto* violation occurs if the change in the law is merely procedural and does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." *Id.* 482 U.S. at 433, 107 S.Ct. at 2452–2453, 96 L.Ed.2d at 362 (quoting *Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)).

"Laws affecting parole are within the ambit of the *ex post facto* clause." *Alston v. Robinson,* 791 F.Supp. 569, 588 (D.Md.1992),

*appeal docketed,* No. 92–6543[L] (4th Cir. May 22, 1992) (citation omitted).

"[T]he retroactive application of a law which mandates a change in parole or other release eligibility criteria is *ex post facto.* Conversely, a law enacting a procedural change which does not "substantially alter[ ] the consequences" of a crime so as to impermissibly increase " 'the quantum of punishment' " is not *ex post facto."*.

*Id.* at 589 (quoting *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966–967, 67 L.Ed.2d 17, which quotes *Dobbert,* 432 U.S. at 293–94, 97 S.Ct. at 2298, 53 L.Ed.2d 344).

While the regulations at issue in this case are DOC classification regulations, rather than laws or other regulations regarding parole, plaintiffs argue that the new classification system set forth in DCRs 100–1 (1/18/88 and 7/1/91) and 155–2 (4/1/91) slows their progress through DOC security levels, thereby affecting their parole eligibility. They assert that the Parole Commission requires that they progress through security levels and spend time on work release before the Commission will consider them for parole. Plaintiffs concede that to succeed in connection with their claims, they must show a causal nexus between classification security level and release on parole.

### A. DCRs 100–1 and 155–2 Are Not "Laws" Within the Meaning of the Ex Post Facto Clause

Defendants argue that the DCRs at issue are not "laws" for purposes of the *ex post facto* clause, but are merely internal DOC classification regulations. However, the *ex post facto* prohibition applies to "changes in administrative regulations that represent an exercise of delegated legislative authority, as opposed to an interpretation of legislation by an agency authorized to execute, not make, laws." *Prater v. U.S. Parole Comm'n,* 802 F.2d 948, 954 (7th Cir.1986) (citing *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 173–74 (7th Cir.1979).

Defendants assert that the DCRs are interpretive, rather than legislative—that they are statements of enforcement policy rather than the exercise of delegated authority to pass rules. Plaintiffs maintain that the

DCR's are legislative. The DCRs were promulgated pursuant to the authority assigned to the Commissioner of the DOC to "adopt and promulgate reasonable rules and regulations" by a Maryland statute, MD.ANN. CODE art. 27, § 676 (1992). Regulations promulgated pursuant to such an express grant of authority from the legislature are legislative, rather than interpretive. *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). As further support for their argument that the DCRs are legislative and are laws for *ex post facto* purposes, plaintiffs point to then-Magistrate Judge (now Judge) Smalkin's opinion in *Green v. Hughes.* In *Green,* the Court considered DCRs 100–3 and 100–14 (6/15/81) and determined that they, by virtue of having been adopted pursuant to statutory authority, fell within the scope of the *ex post facto* clause. *Green v. Hughes,* Civil No. Y–81–1841, slip op. at 3 (D.Md. June 9, 1982).

The determination that the DCRs are legislative, rather than interpretive, however, is not dispositive of the issue of whether they are "laws" for purposes of the applicability of the *ex post facto* clause. While this Court agrees with plaintiffs that the DCRs are legislative, rather than interpretive, and while Magistrate Judge (now Judge) Smalkin's opinion in *Green v. Hughes,* is noted, it is necessary to go beyond the determination of whether a regulation is legislative or interpretive to analyze whether the regulation sufficiently allows for the exercise of discretion so as to be considered simply a guideline, rather than a binding law. Such analysis of discretion has been applied most notably in cases considering the federal parole guidelines.

Several circuits have determined that the federal parole guidelines are not "laws" within the meaning of the *ex post facto* clause, stressing that they did not alter the Parole Commission's inherent ability to exercise discretion in its decisions. Thus, the Seventh Circuit has commented: "The power to exercise discretion indicates that the guidelines are merely guides, and not laws: guides may be discarded where circumstances require; laws may not." *Inglese v. United States*

*Parole Comm'n.,* 768 F.2d 932, 936 (7th Cir. 1985). The court continued: "The key to the finding that guidelines are guides merely, and not laws, is that the Parole Commission has a congressional mandate, expressed both in the statute and the regulations, to exercise discretion. How often that discretion is exercised is immaterial." *Id.* at 937. "[T]he Commission's power to exercise discretion is more significant to our analysis ... than is the frequency with which that power is exercised." *Id.*

The Sixth Circuit, in considering the federal parole guidelines, also determined that "[t]hese guidelines are not law, but guideposts which assist the Parole Commission (and which assisted the Board of Parole) in exercising its discretion.... They are not fixed and rigid, but are flexible. The Commission remains free to make parole decisions outside of these guidelines." *Ruip v. United States,* 555 F.2d 1331, 1335 (6th Cir. 1977); *see also, e.g., Rifai v. United States Parole Comm'n,* 586 F.2d 695, 698 n. 5 (9th Cir.1978) (because the federal parole guidelines were not binding on the Commission, they could not be treated as "laws"); *Wallace v. Christensen,* 802 F.2d 1539, 1554 (9th Cir. 1986) ("Given the discretion retained by the Commission, the frequency with which the Guidelines are followed does not convert the Guidelines into laws for purposes of the *ex post facto* clause."); *Prater v. U.S. Parole Comm'n,* 802 F.2d 948, 954 (7th Cir.1986) (federal parole guidelines are merely guides, not laws); *Dufresne v. Baer,* 744 F.2d 1543,

1550 (11th Cir.1984) (The federal parole guidelines are "stated policy rules that show how agency discretion is likely to be exercised. They do not state rules of conduct for the public.... [T]he guidelines do not have the force and effect of law"), *cert. denied,* 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 49 (1985).[32]

The reasoning of the circuits in the cases discussed immediately *supra* with regard to the federal parole guidelines applies with equal force to the DCRs at issue in the within case. The DCRs themselves provide for the exercise of discretion in their provision for the use of overrides of the instrument's recommendations by the classification teams. *See* DCR 100–1 (7/1/91) App. 3, § 9, App. 4, § C.17, App. 5 § C.17, App. 6, § C. The teams need not follow the instrument recommendations rigidly and inflexibly, but are free to make decisions outside of the instrument recommendations where individual cases warrant an override. Thus, as with the federal parole guideline cases, the DCRs at issue are not "laws" within the meaning of the *ex post facto* clause, but are merely guides. "Given the discretion retained by the [DOC], the frequency with which the [DCRs] are followed does not convert the [DCRs] into laws for purposes of the *ex post facto* clause." *Wallace v. Christensen,* 802 F.2d 1539, 1554 (9th Cir.1986). Thus, though the promulgation of the DCRs was an exercise of legislative authority, that authority is being exercised in a discretionary way, so that the DCRs do not constitute laws under the *ex post facto* clause.[33]

---

**32.** Other courts, while also relying on the discretion remaining in the Parole Commission to hold that the federal parole guidelines do not violate the *ex post facto* clause, base their holding on a different rationale. Some courts have found that changes in "guidelines which merely rationalize the exercise of that discretion [of the parole authorities]" do not offend the *ex post facto* clause," as the changes merely affect the "manner" in which the Commission exercises its already-existing discretion. *Warren v. United States Parole Comm'n,* 659 F.2d 183, 195 (D.C.Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *see also, e.g., Portley v. Grossman,* 444 U.S. 1311, 1313, 100 S.Ct. 714, 715, 62 L.Ed.2d 723, 725 (Rehnquist, Circuit Justice 1980) ("procedural changes" do not violate the *ex post facto* clause). Some courts have held, in the alternative, that retrospective application of the federal parole guidelines does

not result in more onerous punishment and thus does not constitute a violation of the *ex post facto* clause. *See, e.g., Warren,* 659 F.2d at 193; *Rifai,* 586 F.2d at 698–99.

**33.** The Third Circuit seemingly has adopted a somewhat different approach. In a line of cases, that Circuit has held that the federal parole guidelines could constitute laws within the meaning of the *ex post facto* clause depending upon the degree of flexibility with which they are applied. *See United States Ex. Rel. Forman v. McCall,* (Forman I), 709 F.2d 852 (3rd Cir.1983); *U.S.A. Ex rel. Forman v. McCall,* (Forman II), 776 F.2d 1156 (3rd Cir.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). To date, apparently the Third Circuit has not decided where the line should be drawn in terms of what degree of flexibility will convert the guidelines into "law" within the meaning of

### B. DCRs 100–1, 155–2 Do Not Disadvantage Plaintiffs

██ Because this Court concludes that the DCRs are not "laws" within the meaning of the *ex post facto* clause, plaintiffs' claim that they are disadvantaged by the new DCRs need not be reached. However, even if the DCRs were "laws," they would not seem to violate the *ex post facto* clause because they do not disadvantage plaintiffs. Plaintiffs do not argue that they are disadvantaged merely by their alleged slower progress to lower security status under the new DCRs. That is, they do not contend that they are disadvantaged merely because it will take longer for them under the new DCRs to progress to minimum, pre-release, and work release. Indeed, such an argument would fail. *See, e.g., Dyke v. Meachum*, 785 F.2d 267, 268 (10th Cir.1986) (change in internal prison regulations to require prisoner to serve 20% of his sentence before he will become eligible for reclassification to minimum security status, rather than the 10% required under previous policy, held not a violation of the *ex post facto* clause, absent any showing of a punitive intent); *Cf. Gullet v. Wilt*, No. 88–6797, slip op. at 5 [869 F.2d 593 (Table) ] (4th Cir. Feb. 21, 1989) (there is no protected liberty interest in the situs of confinement or in transfers under Maryland law). Rather, plaintiffs argue that they are disadvantaged because their alleged slower progression to lower security delays their consideration for parole release, thereby prolonging their time in confinement. They concede that to succeed on that approach, they must show a causal nexus between classification security level and release on parole.

Plaintiffs have not shown such a nexus. The Parole Commission, not officials of the DOC, decides whether or not to parole inmates serving non-life sentences. MD.ANN. CODE art. 41, § 4–504 (1990). As to inmates serving life sentences, the Parole Commission makes recommendations as to parole to the Governor, who has the final authority to approve or disapprove a grant of parole. *Id.* at § 4–516. Plaintiffs assert that for lifers and for inmates serving sentences of 30 years or longer, the Parole Commission requires that they serve two to three years on work release before it will recommend them for parole. Plaintiffs claim that the parole "policy," in conjunction with their alleged slower progression under the new DCRs, results in their spending more time in confinement, thereby disadvantaging them.

While any hearing examiner or Parole Commissioner determining an inmate's suitability for parole statutorily is directed to consider that inmate's progress during his confinement, *id.* at § 4–506, an inmate's progress through security levels and/or experience on work release are just two of several factors which go into evaluating an inmate's progress. Other factors specified by Parole Commission Policy 2–1 include participation in programs such as drug and alcohol abuse rehabilitative programs, participation in supportive therapy, and participation in vocational and/or educational programming. Thus, the written parole commission policy shows that time on work release is not in and of itself dispositive of whether an inmate will be considered for parole. Moreover, while plaintiffs point to the deposition testimony of parole commissioners Marjorie Jennings and Maceo Williams for support that the Parole Commissioners require time on work release for lifers, and for certain categories of inmates serving long sentences (*i.e.* inmates with no prior work history, inmates with a history of substance abuse, inmates with problems of adhering to rules), that deposition testimony in fact supports the conclusion

the *ex post facto* clause. However, in *Forman II*, the court held that the federal parole guidelines possessed sufficient flexibility of administration so as not to constitute "laws" where there was a 25% deviation from the prescribed guideline ranges. *Forman II*, 776 F.2d at 1163.

Under the Third Circuit's approach, the DCRs at issue in the within case do not appear to be "laws." Field testing of the 1991 DCR revealed that overrides in initial classification occurred in 1% of the cases at MRDCC and in 10% of the cases at MCIW. Overrides occurred in approximately 17.9% of the reclassifications. Report on the Revision of DCR 100–1 (4/4/91), Ex. 1A to Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. (10/2/92) at 2, 6–8. Though lower than the 25% figure relied upon in *Forman II*, such a deviation from the instrument recommendations nonetheless seems "strong evidence of 'substantial flexibility' in the application of the [DCRs]." *Forman II*, 776 F.2d at 1163.

that there is no such requirement. The parole commissioners emphasized that there is no policy requiring time on work release, although they stated that they do want to see some inmates tested on work release and identified some cases in which work release testing would be desirable. However, Maceo Williams stressed that individualized determinations are made on a case-by-case basis. He stressed that work release was merely one factor in the parole determination, and that a commissioner looked at the whole person and all the circumstances surrounding his or her suitability for parole. *See* II.C., *supra.*

Furthermore, the statistics presented to this Court belie the claim that two to three years of work release is required for plaintiffs before their release on parole. As to the statistics relating to the 45 lifers paroled between 1983 and 1989 (see II.C., *supra*), while time spent on work release averaged around 3.5 years, individually there was a large range of time spent on work release, *i.e.* from seven months to eight years. Further, at least three lifers paroled between 1983 and 1989 spent no time on work release. Those statistics reveal individualized determinations and a lack of rigid policy.

The statistics as to all inmates paroled between February 1, 1988, and April 30, 1989 (see II.C., *supra*), showing that 68.2% were released from security levels above the work release level, also support the conclusion that there is no rigid policy that inmates spend time on work release before release on parole.

Thus, plaintiffs have not established an appropriate nexus between security classification and release on parole. Not only is there discretion in the DOC as to classification, there is also discretion in the Parole Commission and in the Governor as to release on parole. Plaintiffs accordingly have not shown that they are disadvantaged sufficiently by the DCRs. Therefore, even if the DCRs were laws, the latter would not violate the *ex post facto* clause.

34. *See* note 12, *supra.*

## V. MD.ANN.CODE ART. 41, § 4–516

Concerning Class A, plaintiffs make the subsidiary argument that the new classification system must be struck down because, they argue, it is inconsistent with the Maryland statute which sets their parole eligibility dates, MD.ANN.CODE art. 41, § 4–516.[34] Plaintiffs claim that the new classification system, in conjunction with the alleged policy of the Maryland Parole Commission to require lifers to serve two to three years on work release prior to recommending them for parole, delays lifers' eligibility for parole beyond their statutory eligibility date. They assert that this Court may entertain this claim under its pendent jurisdiction.

Defendants contend that this state law claim of plaintiffs must be dismissed under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Alternatively, defendants maintain that the new classification system is not inconsistent with MD.ANN.CODE art. 41, § 4–516.

The Supreme Court, in *Pennhurst,* held that the Eleventh Amendment to the U.S. Constitution prohibits suit in federal court against state officials for violations of state law if the requested relief effectively would bind the state. *Pennhurst,* 465 U.S. at 104–106, 104 S.Ct. at 910–911, 79 L.Ed.2d at 81–82. *See also, e.g., Smith v. Robinson,* 468 U.S. 992, 1002 n. 6, 104 S.Ct. 3457, 3463 n. 6, 82 L.Ed.2d 746, 758 n. 6 (1984); *Shell v. Wall,* 808 F.Supp. 481, 485 (W.D.N.C.1992); *Thomas S. v. Morrow,* 601 F.Supp. 1055, 1057 (W.D.N.C.1984), *aff'd in part and modified in part, remanded,* 781 F.2d 367 (4th Cir.1986), *cert. denied,* 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986); *La Rouche v. Sheehan,* 591 F.Supp. 917, 928 (D.Md.1984).

In other words, if the " 'state is the real, substantial party in interest,' " the suit falls within the scope of the Eleventh Amendment. *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908, 79 L.Ed.2d at 79 (citations omitted). In the within case, the relief sought by the plaintiffs would obligate the state to react, by modifying or withdrawing its new regula-

tions. As a result, this Court is foreclosed from considering plaintiffs' argument that the new classification regulations promulgated and applied by the defendants are inconsistent with state law.

The fact that in the within case the state-law claim is pendent to the federal issue makes no difference. *Pennhurst* itself dealt with a pendent state-law claim, and, "[s]ince *Pennhurst*, the Fourth Circuit has repeatedly affirmed trial courts that dismissed pendent state[-]law claims against state officials." *Citizens for Scenic Severn River Bridge, Inc. v. Skinner,* 802 F.Supp. 1325, 1340 (D.Md.1991). *E.g., Huang v. Bd. of Governors of Univ. of North Carolina,* 902 F.2d 1134 (4th Cir.1990), *reh'g denied.*

Furthermore, the contested actions by the defendants are not excluded from Eleventh Amendment protection on the grounds that the acts were ultra vires.[35] The Court in *Pennhurst*, while declining to eliminate the ultra vires doctrine in the Eleventh Amendment context entirely, questioned its "continued vitality" and labeled it a "very narrow exception." *Pennhurst,* 465 U.S. at 114 n. 25, 104 S.Ct. at 915 n. 25, 79 L.Ed.2d at 87 n. 25.[36]

In the instant case, even if this Court were to find the new classification system to be inconsistent with MD.ANN.CODE art. 41, § 4–516, in no way can the defendants' enactment and application of DCRs 100–1 (January 18, 1988 and July 1, 1991) and 155–2 (April 1, 1991) be deemed ultra vires of their authority. The *Pennhurst* Court restricted an ultra vires claim to circumstances in which an officer completely lacks any " 'delegated power. A claim of error in the exercise of that power is therefore not sufficient.' " *Pennhurst,* 465 U.S. at 101 n. 11, 104 S.Ct. at 908 n. 11, 79 L.Ed.2d at 79 n. 11 (citation omitted).

The Fourth Circuit has applied the Eleventh Amendment proscription against pursuing state-law claims against state officials in a federal forum in a similarly expansive fashion. It has excluded from the ultra vires doctrine instances "where state officials [were] alleged to have acted in excess of their authority." *Huang,* 902 F.2d at 1138, *citing Actmedia, Inc. v. Stroh,* 830 F.2d 957, 964 (9th Cir.1986).

The defendants in the instant case acted " 'within the sphere of their official responsibilities,' " whether or not they interpreted those responsibilities correctly, and accordingly are entitled to Eleventh Amendment immunity. *Pennhurst,* 465 U.S. at 107, 104 S.Ct. at 911, 79 L.Ed.2d at 83 (citation and emphasis omitted). "[A]t least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the [s]tate where the relief effectively is against it." *Pennhurst,* 465 U.S. at 113, 104 S.Ct. at 915, 79 L.Ed.2d at 87 (citation omitted). Thus, the plaintiffs' state-law claim that the new classification system is inconsistent with MD.ANN.CODE art. 41, § 4–516 is hereby dismissed.

However, even if this Court were to reach the merits of the state-law claim, the claim would not succeed, as the new classification system is not inconsistent with § 4–516. The classification regulations do not affect the operation of § 4–516. The Maryland Parole Commission retains the right to consider an inmate's suitability for parole once he or she is statutorily eligible. Once a lifer satisfies the requirements of § 4–516, the Commission may consider him or her for parole. Nothing in DCRs 100–1 (January 18, 1988 and July 1, 1991) or 155–2 (April 1, 1991) prohibits the Parole Commission from meeting its statutory obligation.

---

**35.** The ultra vires doctrine removes a claim from the ambit of the Eleventh Amendment, permitting a suit versus a state official. If the official is acting without the color of state authority, beyond the scope of his or her responsibilities, some cases intimate that the Eleventh Amendment does not apply. *E.g. Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The Court in *Pennhurst* drastically restricted the reach of the ultra vires theory.

**36.** The Court criticized the fiction that "injunctive relief against state officials acting in their official capacity does not run against the [s]tate" and cast doubt on the existence of a "principled basis" to the ultra vires doctrine but hesitated to extinguish it entirely. *See Pennhurst,* 465 U.S. at 114 n. 25, 104 S.Ct. at 915 n. 25, 79 L.Ed.2d at 87 n. 25.

## VI. CONCLUSION

For the reasons stated in this opinion, this Court concludes that the DCRs are not *ex post facto* laws, that plaintiffs are not entitled to the grant of any of the pending motions filed by them, and that defendants are entitled to summary judgment. Therefore, judgment is being entered for Defendants.